EXHIBIT 1

## IN THE COURT OF COMMON PLEAS
## CLERMONT COUNTY, OHIO

| | |
|---|---|
| **TOTAL QUALITY LOGISTICS, LLC**<br>4289 IVY POINTE BLVD.<br>CINCINNATI, OH 45245, | Case No. _____ |
| | **Judge** _____ |
| Plaintiff, | |
| **vs.** | |
| **THOMAS C. "CARTER" NEAL**<br>2732 GASTON GATE<br>MT. PLEASANT, SC 29466 | **VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES** |
| and | |
| **DEVINE LOGISTICS, INC. (DBA DEVINE LOGISTICS, LLC)**<br>5608 KATY HILL RD.<br>WADMALAW ISLAND, SC 29487 | |
| **PLEASE ALSO SERVE:** | |
| WESLEY D. BRYANT<br>STATUTORY AGENT<br>DEVINE LOGISTICS, INC.<br>5608 KATY HILL RD.<br>WADMALAW ISLAND, SC 29487 | |
| Defendants. | |

For its Complaint against Defendants, Thomas C. "Carter" Neal ("Neal") and Devine Logistics, Inc., dba Devine Logistics, LLC ("Devine"), Plaintiff Total Quality Logistics, LLC ("TQL"), states as follows:

## NATURE OF THE ACTION

1.      Neal is a former employee of TQL.  At the start of his employment with TQL, Neal signed an Employee Non-Compete, Confidentiality and Non-Solicitation Agreement ("Neal's

EXHIBIT 1

Agreement"). (Attached as Exhibit 1). Neal's Agreement contains one-year restrictive covenants as well as a tolling provision for any period of violation.

2.      Neal is violating the non-compete obligations contained in Neal's Agreement by being employed by TQL competitor Devine. Moreover, upon information and belief, Neal has violated the non-solicitation and confidentiality obligations contained in Neal's Agreement.

3.      Likewise, Devine's continued employment of Neal also involves the misappropriation of TQL trade secrets and constitutes tortious interference with Neal's Agreement with TQL.

4.      TQL seeks injunctive relief (a preliminary injunction and a permanent injunction) prohibiting Defendant's unlawful conduct; compensatory damages; punitive damages; and attorney fees and costs, the collective value of which, in total, state a claim for more than $25,000.

## PARTIES, JURISDICTION, AND VENUE

5.      TQL is an Ohio limited liability company with its principal place of business at 4289 Ivy Pointe Blvd., Cincinnati, Ohio 45245, in Clermont County, Ohio. TQL provides freight brokerage and third-party logistics services to customers throughout the United States.

6.      Neal is a resident of South Carolina. TQL employed Neal from August 22, 2011 to September 30, 2024, in TQL's Charleston, South Carolina office. Neal transacted business in Ohio, including but not limited to brokering freight for entities in Ohio, that subjects him to the jurisdiction of the courts of Clermont County, Ohio. This Court also has personal jurisdiction over Neal because Neal's Agreement was entered into in Ohio. Upon information and belief, Neal has purposefully availed himself of the privilege of conducting activities in Ohio, and such activities are so substantial that it is reasonable to require him to defend a lawsuit in Ohio. This Court also has personal jurisdiction over Neal because by his acts he has caused tortious injury in Ohio, as

further described below. Additionally, this Court has personal jurisdiction over Neal because he has caused tortious injury in this state to TQL by an act outside of this state committed with the purpose of injuring TQL, when Neal might reasonably have expected that TQL would be injured in this state.

7.     Upon information and belief, Devine Logistics, Inc. is a South Carolina corporation. Devine Logistics, LLC was a limited liability company, organized under the laws of the state of South Carolina, before converting to a corporation – Devine Logistics, Inc. – on September 4, 2018. Upon information and belief, Devine Logistics, Inc. uses "Devine Logistics, LLC" as a dba. ("Devine" shall mean both Devine Logistics, Inc. and Devine Logistics, LLC, individually and collectively.) Upon information and belief, Devine has purposefully availed itself of the privilege of conducting activities in Ohio, and such activities are so substantial that it is reasonable to require it to defend a lawsuit in Ohio. This Court also has personal jurisdiction over Devine because Devine by its acts has caused tortious injury in Ohio, as further described below. Additionally, this Court has personal jurisdiction over Devine because it has caused tortious injury in this state to TQL by an act outside of this state committed with the purpose of injuring TQL, when Devine might reasonably have expected that TQL would be injured in this state.

8.     Venue is proper in the Clermont County, Ohio Court pursuant to Rule 3(C) of the Ohio Rules of Civil Procedure as the intentional acts of the Defendants have caused tortious injury to TQL in Clermont County, Ohio.

9.     TQL seeks injunctive relief, compensatory damages, punitive damages, and the recovery of attorney's fees and costs, the collective value of which, in total, state a claim for more than $25,000.

## FACTS

10.     TQL is one of the largest third-party logistics companies in the U.S. and operates in the highly competitive freight brokerage industry. TQL provides freight brokerage services, third-party logistics services, truck brokerage services, and assistance with supply-chain management throughout the United States. TQL has operated as a federally authorized freight broker since 1997.

11.     TQL's customers are companies that want to ship goods from one location to another. Included among these customers are companies that want to ship their own goods and other freight brokers who already agreed to ship goods on behalf of another customer but need assistance finding a carrier to fulfill the shipment.

12.     TQL does not own or operate any of its own trucks or trucking equipment. Nor does it employ any drivers to haul freight. Rather, TQL engages and coordinates independent motor carriers that are able and willing to haul freight at the times and places required by TQL customers.

13.     Devine is a competitor of TQL in the third-party logistics industry. According to its website (https://www.devinelogisticsllc.com), Devine provides a multitude of third-party logistics services and supply chain solutions. TQL provides such services.

14.     Devine, upon information and belief, brokers freight and may assist in providing motor carrier services as an agent for a conglomerate of freight brokers and motor carriers called "Carolina Group of Companies," whose website is http://www.cgcnow.com, using the authority of Carolina National Transportation LLC with its logistics arm (MC #s 309127 and 309108), and/or Fast Freight Systems, Inc. (MC#390289), and/or Freightmaster USA LLC (MC#633563), and/or possibly others.

4

EXHIBIT 1

15.     Upon information and belief, Devine employs five other former TQL employees (not including Neal).  Andrew Wade, listed on Devine's website as Devine's CEO, was formerly a TQL employee who Neal, in fact, trained at TQL.  Matt Haight, listed on Devine's website as Devine's CFO, was formerly a TQL employee.  Daniel Muhly and Alexander Farrington, who appear to also be employed at Devine, also were formerly TQL employees.  Rachel Payne, who worked closely with Neal on TQL accounts at TQL's Charleston office before resigning around the same time as Neal, could also be employed by or in the process of being employed by Devine based upon information and belief.  Some or all of those former TQL employees may be in violation of their respective employment agreements with TQL.

16.     The third-party logistics industry and the freight-shipping industry are extremely competitive.  Relationships with customers, carriers, and other brokers are critical to success.  It is very common in the brokerage industry for companies to have non-compete and non-solicitation agreements with their employees and contractors.

17.     TQL spends significant amounts of time, money, and other resources to develop relationships with new customers and strengthen relationships with existing customers.  TQL has also made substantial investments in developing and protecting the secrecy of its proprietary systems, processes, and procedures that it uses to manage its operations and to compete in the competitive logistics and freight industry.

18.     TQL takes significant measures to protect its trade secrets, customer relationships, and other confidential information.  For example, before beginning employment at TQL, all freight brokers, as well as many other types of employees, must sign restrictive covenants that restrict their ability to compete with TQL, to solicit TQL's customers or employees, or to disclose or misuse TQL's confidential information.

19.     TQL utilizes individualized passwords that must be routinely changed for electronic access to its proprietary and confidential information. TQL employs internal system controls to prevent employees from viewing, downloading, physically removing, and printing certain information, as well as keycards and badges for entry to its offices.

20.     Neal sought employment with TQL and was hired on August 22, 2011. Neal commenced his employment as a Logistics Account Executive Trainee ("LAET"). Neal had no prior experience in freight brokerage or the third-party logistics industry before joining TQL.

21.     TQL invested in providing Neal with extensive, paid training on TQL's logistics and sales strategies and methods to succeed within the industry available only internally to necessary TQL employees, including, without limitation, training on TQL's services, customers, motor carriers, pricing structure for both customers and motor carriers, sales and logistics strategies, and general operations. It also trained on locating, negotiating with, and information regarding the motor carriers used by TQL. TQL has developed and curated this best-in-class training that intersperses module training with live training with a seasoned TQL broker to provide its brokers with the competitive edge necessary to succeed in the industry. TQL's logistics and sales training program generally takes between 8 and 26 weeks to complete. Neal completed the training in approximately 30 weeks.

22.     By virtue of TQL's training program and throughout their employment by TQL, Neal acquired detailed knowledge of TQL's unique operations, including, without limitation: shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and supply-chain management services. Neal also had extensive access to TQL's confidential and highly proprietary information for use in the performance of their job duties, including: proprietary systems, operating policies and procedures, financial records (such as credit

history and other similar information about current and prospective customers, suppliers, and motor carriers), information about pricing and the manner and mode of doing business, the terms of TQL's business dealings and relationships with customers and motor carriers, contracts and agreements of all kinds, sales lists and strategies, and detailed customer and motor carrier lists and information, all of which TQL leverages to provide its industry-leading services.

23.     In consideration for Neal's extensive, paid training provided by TQL, Neal agreed not to be employed in the logistics industry for one year after leaving TQL's employ.

24.     Neal's Agreement states as follows, in pertinent part:

4. <u>Confidential Information is for TQL's Use Only</u>. Unless Employee has prior written consent from TQL, Employee shall not at any time during the course of his or her employment by TQL, and at all times thereafter, use for any purpose or publish, copy, disclose, or communicate to any individual, firm, corporation, or other business entity other than TQL, any Confidential Information, except as properly necessary and authorized by TQL in the conduct of TQL's business.

6. <u>Presumption Regarding Confidential Information</u>. Employee agrees that Employee's engaging in an employment relationship with a Competing Business, as defined in Section 8 below, in a position similar to Employee's position at TQL or in any other position in which the knowledge of TQL's Confidential Information would be beneficial, would necessarily result in Employee revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL.

•••

8(b) <u>Covenants</u>. Employee agrees that... for a period of one (1) year after termination or cessation of Employee's employment for any reason: (i) Employee will not, directly or indirectly, own, operate, maintain or have any other interest (whether as an owner, shareholder, officer, director, partner, member, joint venturer or any other interest) in any Competing Business (as defined below): except that nothing in this subsection prohibits Employee from owning less than 1% of the outstanding equity securities of any publicly-held corporation or entity; and (ii) Employee will not, directly or indirectly, (whether as an employee, agent, consultant, contractor or otherwise), become employed by or engaged in a Competing Business (as defined below), in a capacity similar to that in which the Employee is engaged by TQL or in a capacity in which Employee is in a position to use or benefit from the use of TQL's Confidential Information; and (iii) Employee will not, directly or indirectly, solicit any Customer or Motor Carrier (as

defined below) for any business purpose in competition with or in conflict with the Business of TQL; and (iv) Employee will not, directly or indirectly, interfere with, tamper with, disrupt, or attempt to interfere with, tamper with or disrupt any contractual relationship, or prospective contractual relationship, between TQL and any Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor of TQL, or otherwise take any action to divert Business from TQL; and...(v) Employee will not, directly or indirectly, recruit, solicit, or assist others in recruiting or soliciting any person who is an employee of or consultant with TQL. It is further understood and agreed that the running of the one (1) year set forth in this Paragraph shall be tolled during any time period during which Employee violates any provision of this Agreement.

8(c) <u>Injunction & Enforcement Remedies</u>. If there is a breach or threatened breach of any part of this Agreement, TQL shall be entitled to an injunction restraining Employee from such breach or threatened breach. Alternatively, and additionally, without limitation of remedy, TQL, in its sole discretion, may pursue a claim for damages in tort and/or contract resulting from any breach or threatened breach of this Agreement by Employee. If Employee is found by a court of competent jurisdiction to have violated the terms of this Agreement, Employee shall be liable for costs, expenses, and reasonable attorneys' fees incurred by TQL. Nothing herein shall be construed as prohibiting TQL from pursuing any other legal or equitable remedies that may be available to it for any breach or threatened breach of the Agreement. Furthermore, the Restricted Period (defined above) shall not include any period(s) of violation or period(s) of time required for litigation to enforce the covenants contained in this Agreement.

9. <u>Reasonableness of Restrictions</u>. Employee agrees and acknowledges that the provisions of this Agreement, including the geographic, duration, and content restrictions contained in Section 8 and the restrictions on the disclosure and use of Confidential Information contained in Section 4, are reasonable and fair in all respects and properly required for the adequate protection of the Business of TQL from the disclosure of Confidential Information and unfair competition. Employee further agrees and acknowledges that this Agreement is based upon valuable and sufficient consideration, the receipt of which as of the date of this Agreement is hereby acknowledged.

10. <u>Governing Law and Jurisdiction</u>. This Agreement is made and entered into in the State of Ohio. This Agreement shall be interpreted and enforced under the laws of the State of Ohio, without regard to its conflict of law principles.

25.    When he joined TQL, Neal agreed that TQL's "Confidential Information," whether

or not formally designated as such, was vital to the success of TQL's business and that any

unauthorized use or disclosure of TQL's Confidential Information would cause, or be likely to

cause, substantial and irreparable harm and detriment to TQL and would constitute unreasonable and unfair competition to TQL.

26.     Neal agreed that TQL's Confidential Information was a proprietary trade secret with significant economic value, compiled through a substantial investment of time and money by TQL, and not common knowledge throughout the industry.

27.     Neal promised that he would at all times refrain from using, sharing, or disclosing TQL's Confidential Information to any individual or business entity (except as authorized by TQL in the conduct of TQL's business or as required by law).

28.     Neal acknowledged that association with a business competitive with TQL would result in them revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL.

29.     Neal further agreed that the one (1) year restrictive covenants set forth in Section 8 of Neal's Agreement "shall not include any period(s) of violation or period(s) of time required for litigation to enforce the covenants contained in this Agreement."

30.     TQL's trade secrets, customer lists, and other "Confidential Information" are valuable, special, and unique assets of TQL's business that Neal agreed not to disclose to anyone for any reason, except as required by law.  Neal further agreed that he would not make use of TQL Confidential Information for anyone other than TQL.

31.     Neal agreed that the content, time, and geographic restrictions placed on him by his Agreement were reasonable and required for the protection of TQL's business and that a breach or threatened breach of any part of the Agreement, would entitle TQL to an injunction.

32.     In consideration of Neal's Agreement set forth above, TQL hired Neal. TQL would not have provided Neal with 30 weeks of paid training if Neal had not signed his Agreement.

EXHIBIT 1

Moreover, TQL would not have allowed Neal to gain knowledge of its proprietary customer information or access to TQL key customer relationships if he had not executed his Agreement.

33.     Neal was successful at TQL. TQL promoted Neal to Logistics Account Executive ("LAE" or "Broker"), after the conclusion of his formal training period. Because of his strong performance, TQL subsequently promoted Neal to Logistics Account Executive Saturday Group Leader ("LAESGL"), and, ultimately, to Senior Logistics Account Executive ("SRLAE"). During his career with TQL, Neal served 74 TQL customers (including multiple in Ohio) consisting of companies that used TQL's brokerage services rather than going direct to motor carriers to obtain transportation services, running 56,463 career loads with TQL's network of motor carriers (thousands of which involved Ohio contacts) that produced nearly $37 million in revenue. TQL entrusted Neal to be the seasoned TQL broker who provided live training to 58 other LAETs during his tenure at TQL. Unlikely to be coincidental, Neal trained Andrew Wade while Wade worked at TQL. Wade is listed on Devine's website as its CEO.

34.     Neal was expected to manage relationships with TQL's existing customers and to develop relationships with TQL's prospective customers. As with all TQL LAEs and SRLAEs, Neal had regular contact with those existing and prospective customers and, in fact, served as the main point of contact from TQL for many of those customers and had access to a plethora of information about them, including a history of the lane for which these customers typically needed transportation services and the prices that customers paid to TQL for arranging transportation by load and commodity. Neal also had access to the rates TQL offered motor carriers, even broken down by lane, load and commodity.

35.     Neal resigned from TQL on September 30, 2024, stating that he planned to work at his friend's start-up company, but declined to disclose the name or nature of that company's

EXHIBIT 1

business when asked. Upon his resignation, TQL reminded Neal of his obligations under his Agreement and also provided him a full copy of his Agreement.

36.     There is a significant and grave threat that Neal will utilize (and/or continue to utilize) TQL's confidential information to adversely affect TQL's ability to negotiate favorable rates with affected carriers, and that he will solicit (and/or continue to solicit) the customers he serviced at TQL and other customers of which he is aware of through his access to confidential information to engage in business with Devine (and its conglomerate entities) rather than continuing to utilize TQL's brokerage services.

37.     At all relevant times, Defendants' unlawful actions were willful and wanton, and demonstrated ill will, malice, and reckless or careless disregard towards TQL.

<u>**COUNT I -- BREACH OF CONTRACT**</u>
**(Against Neal)**

38.     TQL incorporates by reference all the previous paragraphs set forth in this Complaint as if fully set forth here.

39.     TQL and Neal entered into Neal's Agreement.

40.     Neal's Agreement is a valid and legally enforceable contract.

41.     Neal's Agreement is reasonable.

42.     TQL performed its obligations and conditions precedent of Neal's Agreement.

43.     As more fully described above, Neal breached his Agreement, *inter alia*, by becoming employed by a Competing Business prior to the expiration of his non-compete obligations, by unlawfully using TQL's Confidential Information, by unlawfully competing with TQL prior to the expiration of his non-compete obligations, by unlawfully soliciting TQL customers and diverting business, and by unlawfully soliciting TQL's employees.

EXHIBIT 1

44.     As a direct and proximate result of Neal's actual or threatened unlawful conduct, TQL has suffered and will continue to suffer irreparable harm.

45.     Monetary damages alone will not be sufficient to remedy all the harm caused to TQL by Neal's breach of his Agreement.

46.     Neal agreed that the content, time, and geographic restrictions placed on him by his Agreement were reasonable and required for the protection of TQL's business and that a breach or threatened breach of any part of his Agreement would entitle TQL to an injunction. Neal also agreed that the extensive, paid training that TQL provided him was consideration for his execution of his Agreement.

47.     As a direct and proximate result of Neal's breach, TQL has suffered, and will continue to suffer, immediate, substantial, and irreparable harm.

48.     TQL has no adequate remedy at law.

49.     Monetary damages alone will not be sufficient to remedy all of the harm caused to TQL by Neal's unlawful actions.

50.     TQL seeks injunctive relief (a preliminary injunction and a permanent injunction) prohibiting Neal's unlawful conduct; compensatory damages; punitive damages; and attorney fees and costs, the collective value of which, in total, state a claim for more than $25,000.

## COUNT II -- TORTIOUS INTERFERENCE WITH A CONTRACT
### (Against Devine)

51.     TQL incorporates by reference all of the previous paragraphs set forth in this Complaint as if fully set forth here.

52.     Neal's Agreement is a valid and binding agreement between TQL and Neal.

53.     At all relevant times, upon information and belief, Devine had knowledge of or reasonably should have been aware of the existence of the Agreement between TQL and Neal prior

12

EXHIBIT 1

to employing Neal. Devine continues to employ Neal despite knowing of the existence of Neal's Agreement. Upon information and belief, Devine employs at least five former TQL employees (not including Neal), each of whom executed an employment agreement similar in form to Neal.

54.     Despite this knowledge, Devine purposefully and intentionally and without justification interfered with Neal's Agreement by, among other things, employing Neal and by engaging him to provide logistics services for Devine in direct competition with TQL and in violation of his Agreement.

55.     Devine has tortiously, willfully, and maliciously ignored the contractual obligations that Neal owes to TQL, without any justifiable excuse, and in bad faith.

56.     As a direct and proximate result of Devine's unlawful actions, TQL has suffered, and will continue to suffer, immediate, substantial, and irreparable harm.

57.     TQL has no adequate remedy at law.

58.     Monetary damages alone will not be sufficient to remedy all of the harm caused to TQL by Devine's unlawful actions.

59.     TQL seeks injunctive relief (a preliminary injunction and a permanent injunction) prohibiting Devine's unlawful conduct; compensatory damages; punitive damages; and attorney fees and costs, the collective value of which, in total, state a claim for more than $25,000.

## COUNT III -- MISAPPROPRIATION OF TRADE SECRETS
### (Against All Defendants)

60.     TQL incorporates by reference all of the previous paragraphs set forth in this Complaint as if fully set forth here.

61.     TQL has trade secrets and develops and maintains confidential and highly proprietary information, including, among other items, software systems, and other proprietary technology, information about its business dealings and relationships with its customers and

13

carriers, customer and carrier lists, transactions, pricing, purchasing information, the manner and mode of doing business, contracts, and agreements of all kinds (including those with customers, carriers and vendors), marketing, and sales and logistics lists and strategies.

62.     TQL's confidential information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, including TQL's competitors. And this information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

63.     TQL's confidential information is protected, in whole or in part, as a trade secret within the meaning of Ohio Rev. Code § 1333.61(D).

64.     As further described above, upon information and belief, Neal has used, threatened to use, and/or inevitably will use TQL's confidential information in connection with his employment with and/or affiliation with Devine. Defendants have willfully misappropriated or threatened to misappropriate TQL's trade secrets including, among other things, TQL proprietary technology, TQL customer and carrier identities, customers and carrier lists, and other customer and carrier information for use against TQL and for the benefit of the Defendants within the meaning of Ohio Rev. Code § 1333.61(B)(2). At the time Defendants misappropriated TQL's trade secrets, they knew they were acquired by improper means and had clear knowledge that he only had access to the protected information under circumstances giving rise to a duty to maintain the information's secrecy.

65.     As a direct and proximate result of the Defendants' actual or threatened misappropriation of TQL's trade secrets, TQL has suffered, and will continue to suffer immediate, substantial, and irreparable harm.

66.    TQL has no adequate remedy at law.

67.    Monetary damages alone will not be sufficient to remedy all of the harm caused to TQL by Defendants' actual or threatened misappropriation of trade secrets.

68.    TQL seeks injunctive relief (a preliminary injunction and a permanent injunction) prohibiting Defendants' unlawful conduct; compensatory damages; punitive damages; and attorney fees and costs, the collective value of which, in total, state a claim for more than $25,000.

## COUNT IV -- CIVIL CONSPIRACY
### (Against All Defendants)

69.    TQL incorporates by reference all of the previous paragraphs set forth in this Complaint as if fully set forth here.

70.    Defendants' actions, in concert with each other, undertaken with the full knowledge and approval of each other, as described herein, resulting in injury to TQL and its relationships with its customers and carriers, constitute a civil conspiracy to intentionally interfere with TQL's business relations with its customers and carriers.

71.    TQL has been proximately damaged by Defendants' civil conspiracy, in an amount to be determined at trial.

72.    In addition, because Defendants' actions were willful and wanton, and demonstrated ill will and malice, TQL is entitled to an award of punitive damages.

73.    TQL seeks injunctive relief (a preliminary injunction and a permanent injunction) prohibiting Defendants' unlawful conduct; compensatory damages; punitive damages; and attorney fees and costs, the collective value of which, in total, state a claim for more than $25,000.

**WHEREFORE**, TQL respectfully requests judgment in its favor and against Defendants as follows:

A.     Award TQL injunctive relief (a preliminary injunction and a permanent injunction) prohibiting Defendants' unlawful conduct; compensatory damages; punitive damages; and attorney fees and costs, the collective value of which, in total, state a claim for more than $25,000.

B.     Award TQL such other and further relief as this Court finds just and proper.

Respectfully submitted,

*/s/ Scott K. Jones*
Scott K. Jones (0069859)
SKJ LAW
3825 Edwards Road; STE 103
Cincinnati, OH 45209
513-410-2074 (T)
513-536-6393 (F)
sjones@skj-law.com

*Counsel for Plaintiff Total Quality Logistics, LLC*

EXHIBIT 1

## VERIFICATION

| | |
|---|---|
| STATE OF OHIO | ) |
| | ) ss. |
| COUNTY OF CLERMONT | ) |

I, Marc Bostwick, the Risk Manager of Total Quality Logistics, LLC ("TQL"), verify that

I am the duly authorized representative of TQL, that I am personally aware of the facts related to

this matter or the facts have otherwise been made known to me, and that the factual allegations in

the verified complaint are true and correct to the best of my knowledge, information, and belief.

Marc Bostwick

## NOTARY PUBLIC

Subscribed and sworn by Marc Bostwick before me, a Notary Public, on this ___10 th___

day of Decemb, 2024.



Lindsay Sadlowski, Attorney at Law
Notary Public, State of Ohio
My Commission Has No Expiration Date
Sec 147.03 RC

Notary Public

**TO THE CLERK:**

Please serve Defendants by FEDERAL EXPRESS, return receipt requested. Thank you.