EXHIBIT 2

FILED

2024 DEC 11 AM 10:57

BARBARA A. WIEDENBEIN
CLERK OF COURTS
CLERMONT COUNTY, OH

**IN THE COMMON PLEAS COURT OF CLERMONT COUNTY, OHIO**
**CIVIL DIVISION**

| | | |
|---|---|---|
| TOTAL QUALITY LOGISTICS, LLC | : | Case No. 2024CVH1724 |
| | : | |
| Plaintiff, | : | **JUDGE FERENC** |
| | : | |
| v. | : | |
| | : | **MOTION OF PLAINTIFF TOTAL** |
| THOMAS C. "CARTER" NEAL, et al. | : | **QUALITY LOGISTICS, LLC FOR** |
| | : | **PRELIMINARY INJUNCTION** |
| Defendants. | : | |
| | : | |

Pursuant to Civil Rule 65, Plaintiff Total Quality Logistics, LLC ("TQL") moves this Court for a Preliminary Injunction against the Defendants Thomas C. "Carter" Neal ("Neal") and Devine Logistics, Inc., dba Devine Logistics LLC ("Devine"), a TQL competitor that employs Neal (collectively "Defendants"). The Twelfth District's recent decision in *Total Quality Logistics, LLC v. Leonard*, 2023-Ohio-2271 (12th Dist.) requires that a former employee, who was provided with specialized training and who immediately transitioned to work for a competitor in violation of a reasonable restrictive covenant, be enjoined from unfairly competing in this manner. Here, Neal is a former TQL employee, to whom TQL provided the same type of specialized training that served as a protectible interest in *Leonard*.

As in *Leonard*, Neal resigned from TQL and immediately transitioned to work for Devine, a direct competitor of TQL, in violation of his non-compete obligations. Additionally, upon information and belief, Neal may be using TQL's Confidential Information to initiate contact with customers he serviced while at TQL for the purpose of selling third-party logistics services for the benefit of Devine. The conduct of Neal (and Devine) is the same type of conduct that *Leonard* compels this Court to enjoin. Unless Neal and Devine are enjoined, TQL will continue to suffer irreparable harm.

1

EXHIBIT 2

This Motion is supported by TQL's Verified Complaint and the following Memorandum of Law. A Proposed Order is attached as Exhibit A.

Respectfully submitted,

*/s/ Scott K. Jones*
Scott K. Jones (0069859)
SKJ LAW
3825 Edwards Road; STE 103
Cincinnati, OH 45209
513-410-2074 (T)
513-536-6393 (F)
sjones@skj-law.com

*Counsel for Plaintiff Total Quality Logistics, LLC*

EXHIBIT 2

## <u>MEMORANDUM OF LAW IN SUPPORT</u>

### I.     INTRODUCTION

If the Motion of Plaintiff Total Quality Logistics, LLC ("TQL") for Temporary Restraining Order and Preliminary Injunction is not granted, TQL will continue to suffer irreparable harm from the conduct of former TQL employee Defendants Thomas C. "Carter" Neal ("Neal") and his new employer, TQL competitor Devine Logistics, Inc., dba Devine Logistics, LLC ("Devine"). Neal is violating his restrictive covenants by being employed by Devine, a direct competitor of TQL in the logistics industry. Upon information and belief, Neal may be using TQL's Confidential Information to contact TQL customers for third-party logistics services. TQL goes beyond the burden of proof in establishing its entitlement to preliminary injunctive relief.

TQL respectfully requests that the Court set this matter for a hearing on a preliminary injunction. TQL requests that this Court enjoin the employment of Neal with Devine, order him to make good on the promises he made in his non-compete (in exchange for receiving TQL's paid, specialized training); order Neal and Devine to cease using any of TQL's confidential and trade secret information; and order Neal to cease actively soliciting TQL's customers. Finally, TQL requests that the Court enjoin Devine from continuing to tortiously interfere with TQL's contracts. Such relief is essential to prevent continuing irreparable harm to TQL during the pendency of this lawsuit.

### II.     FACTUAL BACKGROUND[1]

    A.     <u>TQL Is a Leader in the Highly Competitive Third-Party Logistics Industry</u>

TQL is a national leader in the logistics industry. TQL provides shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and assistance with

---

[1]    All facts recounted here are supported by the Verified Complaint.

EXHIBIT 2

supply-chain management across the continental United States. TQL serves customers around the globe in every industry imaginable. TQL does not own, operate, or lease any of its own trucks or trucking equipment. Rather, TQL engages and coordinates independent carriers who haul freight at the times and places required by TQL's customers.

As the Twelfth District Court of Appeals explicitly recognized, the third-party logistics industry (and the freight-shipping industry at large) is exceptionally competitive. *Total Quality Logistics, LLC v. Alliance Shippers, Inc.*, 2021-Ohio-781, 168 N.E.3d 1228, ¶ 108 (12th Dist.). Among other things, relationships with customers, carriers, and other brokers are essential to sustained success within the industry. TQL spends a great deal of time, money, and other resources developing relationships with new customers and strengthening relationships with existing ones. Further, TQL has made substantial investments to develop and protect the secrecy of its proprietary systems, processes, and procedures it uses to manage its operations and to compete in this hyper-competitive industry. TQL protects its trade secrets and confidential information by conditioning employee access upon use of constantly changing passwords, and the implementation of internal controls that prevent employees from downloading or printing certain information.

B.  TQL Provides Specialized Logistics Training to the Unexperienced Neal

Neal had no prior logistics experience before joining TQL. He joined TQL as a Logistics Account Executive Trainee ("LAET") on August 22, 2011. TQL paid Neal a salary to learn about the logistics industry and how to succeed brokering freight while he participated in TQL's specialized training program, which took Neal 30 weeks to complete. The specialized training TQL provided to Neal included programs on topics such as pricing, specialized freight requirements, rate structure, sales strategies, and how to develop relationships with customers in the logistics industry. During his employment, Neal also had access to various types of TQL's

2

trade secrets and confidential information. Most critically, for purposes of this Motion, Neal was provided intimate knowledge of TQL's secret sauce in how to succeed in the brokerage business.

C.     Neal Agrees to Restrictive Covenant Obligations in Exchange for TQL Providing Him with Paid, Specialized Training

Understandably, given the power and access to information that TQL entrusted in Neal, in order to protect that information and TQL's customer and carrier relationships from being misused, TQL had Neal execute an "Employee Non-Compete, Confidentiality and Non-Solicitation Agreement" ("NCA" or "Neal's Agreement", which is attached to the Verified Complaint as Exhibit 1).

Neal agreed that TQL's "Confidential Information," as that term is defined in their Agreement, whether formally designated as such, is vital to the success of TQL's business and that any unauthorized use or disclosure of TQL's Confidential Information would cause, or be likely to cause, substantial and irreparable harm and detriment to TQL and would constitute unreasonable and unfair competition to TQL. (Neal's Agreement at Recitals 5 and 7).

Neal also agreed that TQL's Confidential Information is a proprietary trade secret with significant economic value, compiled through a substantial investment of time and money by TQL, and is not common knowledge throughout the industry. Neal promised upon the termination of his employment with TQL that he would never use, share, or disclose TQL's Confidential Information to any individual or business entity (except as authorized by TQL in the conduct of TQL's business or as required by law). Neal acknowledged his understanding that employment with a competing business "would necessarily result in [him or her] revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL." (Neal's Agreement § 6).

3

EXHIBIT 2

The paid, specialized training that TQL provided Neal for 30 weeks was substantial consideration for his agreement not to be employed by a competitor in the logistics industry. Neal specifically agreed that for a period of one (1) year after the termination of his employment he would not:

    (1)    directly or indirectly "become employed by or engaged in a Competing Business (as defined below), in a capacity similar to that in which Employee is engaged by TQL or in a capacity in which Employee is in a position to use or benefit from the use of TQL's Confidential Information;"

    (2)    "directly or indirectly, solicit any Customer or Motor Carrier (as defined below) for any business purpose in competition with or in conflict with the Business of TQL;"

    (3)    "directly or indirectly, interfere with, tamper with, disrupt, or attempt to interfere with, tamper with or disrupt any contractual relationship, or prospective contractual relationship, between TQL and any Customer, Motor Carrier, client, consultant supplier, vendor, lessee, or lessor of TQL, or otherwise take any action to divert Business from TQL;" and

    (4)    "directly or indirectly, recruit, solicit, or assist others in recruiting or soliciting any person who is an employee of or consultant with TQL." (*Id.* at § 8(b)).

In Section 8(b) of his Agreement, Neal also agreed that the running of the one (1) year restrictions "shall be tolled during any time period during which [he] violates any provision of this Agreement."

In the Recitals and Sections 4 of his Agreement, Neal agreed that TQL's trade secrets, customer lists and other "Confidential Information" were valuable, special, and unique assets of TQL's business, and that he would not disclose such information "to any individual, firm,

EXHIBIT 2

corporation, or other business entity ... except as properly necessary and authorized by TQL in the conduct of TQL's business." Neal also agreed that he would not make use of any such property for the benefit of any person or entity other than TQL under any circumstance. (Neal's Agreement § 4).

Neal agreed that the content, time, and geographic restrictions placed on him by his Agreement are reasonable and properly required for the adequate protection of the business of TQL. (*Id.* at § 9). He agreed that if there is a breach or threatened breach of any part of the Agreement, TQL shall be entitled to an injunction restraining him from breach or threatened breach. (*Id.* at § 8(c)). Additionally, Neal agreed that TQL, in its discretion, would be entitled to pursue a claim for damages, including TQL's costs, expenses, and reasonable attorneys' fees incurred. (*Id.*).

D.   Neal Violates his TQL Agreement Through His Employment with Devine

Devine is a competitor of TQL in the third-party logistics industry. According to its website (https://www.devinelogisticsllc.com), Devine provides a multitude of third-party logistics services and supply chain solutions. TQL provides such services. Devine does not appear to have a freight brokerage license through the U.S. Department of Transportation's Federal Motor Carrier Safety Administration. But, upon information and belief, Devine brokers freight and may assist in providing motor carrier services as an agent for a conglomerate of freight brokers and motor carriers called "Carolina Group of Companies," whose website is http://www.cgcnow.com. Devine likely uses the authority of Carolina National Transportation LLC as its logistics arm (MC #s 309127 and 309108), and/or Fast Freight Systems, Inc. (MC#390289), and/or Freightmaster USA LLC (MC#633563), and/or possibly others.

EXHIBIT 2

On September 30, 2024, Neal terminated his employment with TQL, informing TQL that he was going to work for his friend's start-up business. Devine now employs Neal. Upon information and belief, Neal is actively brokering freight for Devine and, upon information belief, Neal may be actively soliciting customers that he called upon or learned about through his employment with TQL. Additionally, upon information and belief, Neal may be using TQL's Confidential Information to unlawfully and unfairly compete with TQL by brokering freight for Devine.

## III. TWELFTH DISTRICT CASELAW REQUIRES THAT THE UNLAWFUL COMPETITION OF NEAL BE ENJOINED

### A. The Twelfth District Has Repeatedly Held that TQL's Non-Compete Agreements are Reasonable and Enforceable

Non-competition covenants are enforceable so long as they are reasonable. See *Lake Land Employment Group of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 2004-Ohio-786, ¶ 9. "A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 26 (1975). As discussed below, each of the factors *Raimonde* identifies for enforceability weighs in TQL's favor with respect to Neal.

#### 1. *TQL Has A Protectible Interest in the Retention of its Trained Employees*

The Twelfth District has crystallized legitimate business interests supporting the enforcement of a non-compete and found that they apply to TQL's non-compete agreements. First, and directly applicable here, the Twelfth District has held that TQL had a legitimate business interest in retaining employees TQL had extensively trained from immediately transitioning to a competitor to compete unfairly in violation of a restrictive covenant: "We have recognized that

6

another legitimate purpose of a noncompete agreement is the retention of employees in which an employer has invested time and other resources." *Leonard*, supra at ¶ 27; see also *Total Quality Logistics, LLC v. BBI Logistics, LLC,* 2024-Ohio-2597, ¶ 30 (12th Dist.); *Total Quality Logistics, L.L.C. v. Alliance Shippers, Inc.*, 2021-Ohio-781, ¶¶ 107-08. In citing *Alliance*, *Leonard* further held:

> 'When considering the legitimate business interest of TQL in this instance, we find this factor weighs in favor of finding Alliance's interference was improper. As noted by the trial court, such noncompete agreements are commonplace in the logistics field, and due to the competitive nature of the industry, such agreements are vital in protecting the interests of companies, like TQL, who elect to hire and extensively train new employees with no prior experience in the field. Thus, we find TQL had a legitimate interest in restricting [the former TQL employee] from immediately transitioning to [the TQL competitor] and providing [the TQL competitor] with an unfair advantage as TQL's competitor.'

*Leonard* at ¶ 27 (citing Alliance at ¶ 107.)

In both *Alliance* and *Leonard,* former TQL employees, with no prior logistics experience who received extensive specialized training by TQL, left TQL's employ and immediately began working for a TQL competitor in violation of their restrictive covenants. *Alliance* at ¶¶ 107-108; *Leonard* at ¶¶ 27-31. As with the former TQL employees in *Alliance* and *Leonard*, Neal had no prior logistics training and received the benefit of the same months-long training from TQL. They each also brokered freight at TQL, with Neal rising to the position of Senior Logistics Account Executive ("SRLAE"). And upon leaving TQL's employ, each began competing against TQL through their employment with a TQL competitor in violation of their restrictive covenants.

Neal left TQL's employ on September 30, 2024, and his restrictive covenant obligations run for one year from that date absent a violation of it. Neal is now employed at TQL competitor Devine and, upon information and belief, is brokering freight in unfair, direct competition with TQL in the logistics industry.

Here, this Court must evaluate Neal's Agreement in consideration of the nearly identical non-competes in *Alliance* and *Leonard* that the Twelfth District found reasonable and enforceable. Moreover, because the salient facts are nearly identical in those cases to the circumstances here, the Court should reach the same conclusion as the Twelfth District in *Alliance* and *Leonard* did. TQL has established a protectible interest in preventing Neal from working in direct competition with TQL during the one-year restrictive period.

> ### 2. *TQL Has a Protectible Interest in Preventing the Disclosure of its Confidential and Proprietary Information*

Likewise, the Twelfth District has held that preventing the disclosure of TQL's trade secrets or the use of its confidential and proprietary information is a legitimate business interest for enforcing TQL's non-compete. *Alliance* at ¶ 27; *Leonard* at ¶ 27. *Leonard* found that former TQL Logistics Account Executive Erin Leonard was imbued with TQL's confidential information: "through her extensive training and employment with TQL, Leonard had access to TQL's customer data and confidential information such as expense information, pricing, profitability and margin information, the individualized needs and requirements of TQL customers, and the contact information for customers, and that she knew TQL's software and its marketing and business strategy." *Leonard*, at ¶ 29.

Here, Neal was a Senior Logistics Account Executive who worked at TQL for more than 13 years. TQL provided Neal access to the same type of TQL confidential and proprietary information as Ms. Leonard, who was in a position junior to that achieved by Neal. And, like Ms. Leonard, upon information and belief, Neal may be using TQL Confidential Information to solicit customers that he serviced while employed by TQL.

TQL has a legitimate business interest in the protection of its confidential and proprietary information through enforcement of Neal's Agreement.

8

EXHIBIT 2

3. *TQL Has A Protectible Interest In Its Customer Relationships And In Non-Solicitation of Its Customers*

TQL has a third legitimate business interest, which has been recognized by the Twelfth District and other Ohio courts—retaining customer goodwill by preventing the use of TQL's customer information by a former employee. Specifically, the Twelfth District has held: "One legitimate purpose of a noncompete agreement is to prevent . . . . the use of a former employer's proprietary customer information to solicit the former employer's customers." *Leonard* at ¶ 27, *citing Brentlinger Enterprises v. Curran*, 141 Ohio App.3d 640 (10th Dist. 2001).

Again, Neal had no previous experience or employment in the logistics industry. Neal and developed customer relationships on behalf of TQL, on TQL's dime. When Neal resigned from TQL to join Devine to unfairly compete against TQL, upon information and belief, he may be using his customer contacts that he learned exclusively from his time at TQL and immediately began to solicit their business.

The Twelfth District recently reaffirmed the legitimacy of an employer's "interest limiting 'a former employee's ability to take advantage of personal relationships the employee has developed while representing the employer to the employer's established client, [and] also in preventing a former employee from using his former employer's customer lists or contacts to solicit new customers.'" *Total Quality Logistics, LLC v. BBI Logistics, LLC*, supra at ¶ 30, *citing UZ Engineered Products Co. v. Midwest Motor Supply Co.*, 147 Ohio App.3d, 382, 396, *citing Rogers v. Runfola & Assoc., Inc.* 57 Ohio St.3d 5, 8-9 (1991).

Additionally, similar to the facts here, in *UZ Engineered Products* the court held that the employer presented a legitimate business interest in restricting its former employees' ability to solicit customers for a competitor where the employee "had acquired extensive information regarding [the former employer's] products and sales practices, including pricing, that would be

9

advantageous to a competitor in soliciting customers, regardless whether the customers had been former or existing customers of plaintiff or its former employees." 147 Ohio App.3d at 397.

Under binding Twelfth District precedent and other Ohio case law, TQL has a legitimate business interest in preventing Neal from damaging TQL's customer relationships by leveraging their relationships with TQL's customers that he formed while working for TQL to benefit Defendants. As specifically recognized by controlling authority, TQL has a legitimate business interest in protecting its relationships through the Non-Solicitation provision in the NCA.

B.    Neal's Agreement is Reasonable and Enforceable Under *Raimonde*

Courts assess nine factors to determine whether a restrictive covenant is reasonable and therefore enforceable. See *Raimonde v Van Vlerah* (1975), 42 Ohio St.2d 21, 25. Neal's Agreement satisfies all of these factors (although satisfying all is not required for enforceability):

- Time/space limitations. The covenants in Neal's Agreement are limited to one year, which is a reasonably short time in a competitive industry where employees are the primary points of contact with customers. And because TQL operates nationwide, the nationwide geographic restriction is also reasonable and consistent with covenants enforced in similar contexts. See, e.g., *Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 271 (1st Dist. 2000) (enforcing three-year worldwide covenant).

- Point of contact with customers. At TQL, Neal interacted with many customers of TQL in need of third-party logistics services, often as the customer's main contact. Neal developed 74 customers and ran 56,463 loads for the customers while at TQL. Given Neal's responsibility for cultivating, maintaining, and advancing customer relationships, this factor of the test is clearly satisfied with respect to his Agreement.

- Access to Confidential Information. Neal had access to TQL Confidential Information, such as TQL customer information and prospect information, brokerage revenue, lane information, customer contract information, and TQL's proprietary software Load Manger. As described above, upon information and belief, Neal may be using TQL Confidential Information to solicit customers he called on or learned about through his employment at TQL.

- Elimination of unfair competition. Neal's Agreement seeks only to address unfair competition – the unlawful employment of Neal with Devine, the use of TQL's Confidential Information, and the pilfering of customers and carriers. As the

EXHIBIT 2

Twelfth District explained in *Leonard, supra*, a trained employee who immediately transitions to a competitor in violation of a noncompete is engaging in unfair, not fair, competition.

- <u>Stifling of inherent skill/experience</u>. The covenants do not stifle either Neal's inherent skills or experiences. Before joining TQL, Neal had no experience whatsoever in the logistics industry. It was not until after Neal received extensive training at TQL and was provided access to a trove of TQL's confidential and proprietary information that he gained significant skill and experience in the logistics industry. Therefore, none of Neal's skills or experience in the logistics industry are "inherent."

- <u>Benefit to employer proportionate to harm to employee</u>. Again, the only benefit derived by TQL from Neal's Agreement is the prevention of unfair competition, through the utilization of TQL's specialized training, the improper use and disclosure of TQL's Confidential Information, and the exploitation of TQL's relationships with its customers. The knowledge, experience, and confidential and proprietary information relating to the logistics and freight brokerage industry that Neal gained through his employment at TQL would provide him with the industry knowledge and critical contacts to succeed in the logistics industry – specifically at a competitor. Neal has inevitably used and will continue to use TQL's confidential and proprietary information for Defendants' benefit. This is precisely the type of unfair competition and conduct that Neal's Agreement is reasonably designed to prevent.

- <u>Bar on sole means of support</u>. Neal's Agreement does not eliminate Neal's ability to work. So long as he does not unfairly compete against TQL in TQL's industry, use or disclose TQL's Confidential Information, or solicit TQL's customers and carriers, Neal may work in the occupation of his choice.

- <u>Talent developed during employment</u>. Neal's experience in the logistics industry started at TQL. He was provided extensive training not only with respect to the industry, but on TQL's specific policies, procedures, and strategies for success in that industry. TQL is unaware of any other such experience gained by Neal prior to his employment with TQL.

- <u>Whether forbidden employment is incidental to main current employment</u>. Upon information and belief, Neal has assumed a similar, if not precisely the same, position at Devine that he had at TQL, brokering freight in the logistics industry. There is no portion of Neal's current position that would not violate the plain language of the restrictive covenant. In other words, it would be impossible for Neal to work at Devine without violating his Agreement.

EXHIBIT 2

As indicated above, all of the factors for consideration favor enforcement of the restrictive covenants, which makes Neal's Agreement reasonable in both scope and content. Accordingly, Neal's restrictive covenants are enforceable.

C. The Twelfth District Has Held it is Error Not to Enjoin the Breach of TQL's Non-Compete Agreements

The Twelfth District recently articulated the standard for granting an injunction:

> An injunction is an extraordinary remedy in equity, and being a creature of equity, it may not be demanded as a matter of right. *Perkins v. Village of Quaker City*, 165 Ohio St. 120 (1956), syllabus. "'It is well-established that in order to obtain an injunction, the moving party must show by clear and convincing evidence that immediate and irreparable injury, loss or damage will result to the applicant and that no adequate remedy at law exists.'" *Total Quality Logistics, L.L.C. v. Tucker, Albin & Assocs.*, 12th Dist. Clermont No. CA2021-06-031, 2022-Ohio-1802, ¶ 27, quoting *Middletown v. Butler Cty. Bd. Of Cty. Commrs.*, 12th Dist. Butler No. CA94-03-084, 1995 WL 55382, *2 (Feb. 13, 1995). Injunctive relief may also be available "to the extent that irreparable harm is actually threatened." *Id.* Irreparable injury or harm has been defined as "an injury for the redress of which, after its occurrence, there could be no plain, adequate and complete remedy at law, and for which restitution in specie (money) would be impossible, difficult or incomplete." *Id.*

*Total Quality Logistics, LLC v. Johnson*, 2023-Ohio-1319, at ¶ 29 (12th Dist.).

A party seeking emergency and preliminary injunctive relief must establish by clear and convincing evidence that: (1) the party is likely to succeed on the merits; (2) an injunction is necessary to prevent irreparable harm; (3) the balance of equities is in the moving party's favor; and (4) an injunction is in the public interest. *Cleveland v. Cleveland Elec. Illuminating Co.*, 115 Ohio App.3d 1, 12 (8th Dist. 2007). No one factor is dispositive. Instead, the Court balances the factors to determine whether the sought relief is appropriate. *Id.*

In a case with strikingly similar facts, *Leonard*, *supra*, the Twelfth District held that the trial court erred by refusing to enjoin Ms. Leonard's employment, in violation of her non-compete,

EXHIBIT 2

with a TQL competitor because Leonard's employment with a competitor breached her restrictive covenant obligations to TQL. *Leonard*, at ¶ 51. Likewise, here, Neal is breaching his restrictive covenants by using his paid, specialized TQL training and TQL's Confidential Information to compete unfairly against TQL and by being employed by TQL competitor Devine prior to the expiration of his noncompete obligations. *Leonard* requires that Neal be enjoined from continued unfair competition with TQL.

      D.    <u>TQL Is Likely to Succeed on the Merits</u>

There are three restrictive covenants at issue: (1) the one-year non-compete; (2) the one-year non-solicitation of customers; and (3) the use and disclosure of TQL's Confidential Information. The conduct of Defendants also threatens to violate trade secret statutes and Ohio tort law regarding the unlawful interference with contracts. Each of these bases are sufficient, on their own, to establish the entitlement to injunctive relief.

      *1.*    *Neal Breached His Agreement with TQL*

Neal's Agreement contains a one-year non-compete provision and non-solicitation provision pertaining to TQL customers. The Agreement also prohibits the use and disclosure of TQL's Confidential Information, including information related to TQL customers.

It is beyond dispute that as an employee of Devine, a direct competitor of TQL in the logistics industry, Neal is unfairly competing prior to the expiration of his restrictive covenants. Moreover, in doing so, just as the Twelfth District concluded in *Leonard*, Neal is invariably using, or poised to use, TQL's Confidential Information to make sales and to benefit Devine. Like in *Leonard*, Neal was immersed in TQL's Confidential Information concerning the individualized needs and requirements of TQL customers, route pricing, selection of motor carriers, profitability and margin information, expense information, contact information for customers, and knowledge

concerning TQL's software and its marketing and business strategy.  See *Leonard*, *supra* at ¶ 29.
Accordingly, TQL is likely to succeed on the merits of its breach of contract claim**.**

2.      *Defendants Will Continue to Violate the Ohio Uniform Trade Secrets Act*

TQL is also likely to prevail on its claim under the Ohio Uniform Trade Secrets Act.  Upon
information and belief, Neal and Devine threaten to misappropriate TQL's trade secrets and
Defendants' actions threaten the unlawful use of TQL's trade secrets.  Misappropriation is defined,
in relevant part, as "acquisition of a trade secret by a person who knows or should know it was
acquired by improper means, and disclosure or use of that trade secret without (TQL's) consent by
persons who acquired it by improper means or who knew it was acquired by improper means."
R.C. §1333.61(B).  Here, as described above, Defendants' conduct threatens the use of TQL's
Confidential Information – the identity of TQL customers and prospects, the identity of the
gatekeepers for customers and prospects, and contact information for those gatekeepers -- to divert
business from TQL for the benefit of Devine.

TQL's Confidential Information that Defendants are using undoubtedly qualifies as a trade
secret under Ohio law.  Neal took more than 13 years' worth of knowledge of TQL's trade secrets
to Devine to unlawfully compete with TQL.  A trade secret is defined as "information, including
a compilation or listing of names, addresses, or telephone numbers, that (1) 'derives economic
value actual, or potential, from not being generally known to, and not being readily ascertainable
by proper means by, other persons who can obtain economic value from its disclosure or use; and
(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."
R.C. 1331.61(D).

Here, as *Leonard* held, the logistics industry is hyper-competitive.  The lifeblood of TQL's
business is the customer relationships it has developed over decades.  TQL takes great efforts to

14

guard the secrecy of information regarding its customers, through electronic means (employees must change passwords periodically to even have access to the system), training regarding the confidential nature of the information, and by contract (prohibiting the use of the information outside of TQL for anyone's benefit except TQL).

The Ohio Uniform Trade Secrets Act explicitly provides for an injunction to be issued in the event of actual or threatened misappropriation. See R.C. 1333.62(A). Here, both grounds unequivocally exist. Thus, even independent of the other claims for which TQL has demonstrated a likelihood of success on the merits, injunctive relief is warranted on the basis of the misappropriation claim alone.

### 3. *Devine Is Tortiously Interfering with Neal's Agreement*

Devine's employment of Neal despite its knowledge of his Agreement with TQL constitutes an intentional interference with TQL's contractual relations. "The torts of interference with business relationships and contract rights generally occur when a person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not perform a contract with another." *Ginn v. Stonecreek Dental Care*, 30 N.E.3d 1034, 2015-Ohio-1600, ¶ 11, quoting *A&B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 4 (1995). To prevail on a claim of tortious interference with contract, TQL must demonstrate: (1) the existence of a contract, (2) known to the wrongdoer, (3) who without justification to do so takes an intentional action to procure the breach of that contract, (4) resulting in damages. *Id.* at ¶ 12. TQL is likely to succeed on the merits of its tortious interference claim against Devine.

Devine has tortiously interfered with TQL's contractual relations with Neal. Devine was keenly aware of Neal's employment with TQL prior to hiring him. In fact, Devine's CEO Andrew Wade is a former TQL employee who Neal trained while at TQL. Devine nonetheless continues

15

to employ Neal, thereby procuring his breach of his Agreement with TQL without justification. Indeed, had Devine respected the terms in Neal's Agreement and refrained from providing him a platform to breach his Agreement, TQL's confidential and trade secret information would not be at risk of disclosure to Devine, TQL's direct competitor. TQL has been irreparably harmed by Devine's tortious interference with Neal's Agreement.

### 4. *Only an Injunction Will Stop TQL's Irreparable Harm*

To obtain an injunction, a plaintiff must also show that it will suffer irreparable injury in the absence of such relief. Even when the threatened harm is monetary, it is considered irreparable if the legal remedy would be speculative or difficult to calculate. See *Mid-America Tire, Inc. v. PTZ Trading Ltd.*, 95 Ohio St.3d 367, 2002-Ohio-2427, ¶ 82-83. Damages flowing from lost sales, for example, are speculative because the calculation relies on imperfect estimates. *Id.* Damages pertaining to lost customers are likewise speculative because it cannot be determined with certainty how long a customer would continue working with a plaintiff in the absence of the defendant's conduct. See *Penzone, Inc. v. Koster*, 2008-Ohio-327, ¶ 23 (10th Dist.); see also, *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992) (holding that loss of customer goodwill and fair competition is likely to irreparably harm employer). Critically, a plaintiff need not show actual harm; the threat of harm is sufficient. See *Convergys Corp, v. Tem*, 169 Ohio App.3d 665, 2006-Ohio-6616, fn 8 (1st Dist. 2006).

Irreparable harm is an injury for which there is no plain, adequate, and complete remedy at law, and for which money damages would be impossible, difficult, or incomplete. *Leonard*, *supra* at ¶ 50. In actions to enforce noncompete agreements, "a threat of harm warranting injunctive relief can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun

16

EXHIBIT 2

employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." *Leonard* at ¶ 50, quoting *P&G v. Stoneham*, 140 Ohio App.3d 260, 274 (1st Dist. 2000). In *Leonard*, the Twelfth District recently held that the trial court, in a similar case, committed reversible error where it denied TQL injunctive relief after a freight broker violated her non-compete with TQL by immediately joining a competing freight brokerage company. *Leonard* at ¶ 50.

Ohio courts are in uniform agreement with the reasoning in *Leonard* that a former employer is irreparably harmed when an employee attempts to start his own business by taking away the customers he serviced for his former employer and by using the employer's own customer lists to build that new business. See, e.g., *Blakeman's Valley Office Equip., Inc. v. Bierdeman*, 2003-Ohio-1074, ¶ 37 (7th Dist.), citing *Robert W. Clark, M.D., Inc., v. Mt. Carmel Health*, 124 Ohio App.3d 308, 317 (10th Dist. 1997) ("Appellee was attempting to start his own business by taking away the customers he serviced while employed by Copeco and by using Copeco's own customer lists to build that new business. This is precisely the type of irreparable harm that a covenant not to compete is designed to prevent."); *B.J. Alan Co. v. Andrews*, 2007-Ohio-2608, ¶ 54-56 (7th Dist.) (same); *Charles Penzone, Inc. v. Koster*, 2008-Ohio-327, ¶ 23 (10th Dist.) (loss of client goodwill and lost client revenue almost impossible to quantify and therefore evidence of irreparable harm); *Mike McGarry & Sons, Inc. v. Gross*, 2006-Ohio-1759, ¶ 20, (8th Dist.) ("Attempting to start one's own business by taking away customers that were serviced by a former employer is precisely the type of irreparable harm that a covenant not to compete is designed to prevent." (citation omitted).

Moreover, TQL has a light burden here to show irreparable harm because it has a high likelihood of success on the merits: "if there is a strong likelihood of success on the merits, an injunction may be granted even though there is little evidence of irreparable harm and vice versa."

17

EXHIBIT 2

*AK Steel Corp. v. ArcelorMittal USA, LLC*, 2016-Ohio-3285, ¶ 10 (12th Dist.) (citation omitted). See, also, *Mike McGarry & Sons, Inc.*, *supra* at ¶ 19; *Bierdeman*, *supra* at ¶ 37 (citation omitted) ("Because it is highly likely to prevail on the merits, Appellant has less of a burden to show irreparable harm.").

Still further, the Ohio Uniform Trade Secrets Act explicitly provides for an injunction to be issued in the event of either actual or threatened misappropriation. See R.C. 1333.62(A).

Unless immediate injunctive relief is issued, TQL will continue to suffer harm from Defendants' conduct. Neal is working for a direct competitor of TQL, using the training and experience that TQL provided them. There can be little doubt that Neal is actively soliciting TQL's customers, and likely is soliciting TQL's customers with whom he developed relationships on TQL's dime when he worked at TQL. Neal has the opportunity to use and exploit all Confidential Information that he obtained from TQL to unfairly compete on behalf of Devine, one of TQL's direct competitors. As Neal acknowledged in his Agreement with TQL, the harm resulting from this unfair competition, and the resultant damage to TQL's revenues, goodwill, and customer and carrier relationships will be difficult, if not impossible, to calculate. Thus, TQL has satisfied this element of the injunctive relief analysis.

E.     The Balance of Equities Favors Injunctive Relief

When determining whether to grant injunctive relief, courts balance the potential injury to the defendant against the harm that the plaintiff will suffer if an injunction is denied. See *Cleveland Elec. Illuminating Co.*, 115 Ohio App.3d at 12. Where the only potential harm to a defendant is an inability to further violate a restrictive covenant, this factor will weigh in the employer's favor. See *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 854 (S.D. Ohio 2000) (concluding that enforcement visited no harm because defendant was aware of the restrictive covenants).

Just weeks ago, Judge Haddad rejected an argument that enforcing TQL's NCA and enjoining someone who had worked in the freight brokerage industry for his entire adult life was cruel and unjust:

> The Court would note that the defendant argues that requiring someone who has worked in the freight logistics industry his entire adult life to stop doing so for almost 11 months is cruel and unjust. However, also cruel, unjust, and even unfair is someone agreeing not to work for a competing business, resigning from TQL while taking with him all the skill, knowledge, expertise, and information that TQL taught him, and then immediately begin working for a competing business.

*Total Quality Logistics, LLC v. Covar Transportation*, Clermont C.P. No. 2017 CVH 1403, pp. 11-12 (Oct. 30, 2024) (Haddad, J.) (attached).

Similarly, in *Leonard*, the Twelfth District determined that enforcing TQL's Non-Compete did not impose an undue hardship on Leonard. *Leonard* at ¶ 26-31; see, also, *Total Quality Logistics, LLC v. OTC Logistics LLC*, S.D.Ohio No. 1:19-cv-151, 2019 U.S. Dist. LEXIS 46660 (Mar. 21, 2019) ("Cain willingly entered into the Agreement in order to work at TQL. Any harm that comes to Cain as a direct result of breaching the non-competition provision in the Agreement does not factor into the Court's balancing of harms." (citation omitted)).

Defendants are the only parties who could be "harmed" by issuance of an injunction. But such "harm" would only mean that Neal and Devine are prohibited from unfairly competing in violation of Ohio law. Thus, any harm Defendants would suffer is far outweighed by the detrimental impact on TQL's ability to compete fairly and to safeguard its confidential information, customer relationships, and goodwill. Defendants should not be permitted to continue benefiting from the knowing breach of contractual, statutory, and tort duties. Thus, the equities favor issuing the injunction.

EXHIBIT 2

F.     The Public Interest is Promoted by Issuance of an Injunction

As a general matter, upholding and enforcing contracts is in the public interest.  See *Century Bus. Servs., Inc, v. Urban*, 179 Ohio App.3d 111, 2008-Ohio-5744, ¶ 17 (8th Dist.).  Neal freely and without duress entered into his Agreement containing the restrictive covenants.  In his Agreement, Neal acknowledged the importance of both TQL's Confidential Information and the need to protect it, including, but not limited to, customer-related information and relationships.  Neal even agreed that TQL is entitled to injunctive relief for any actual or threatened breach of the restrictive covenants.

Furthermore, courts recognize that there are overriding public interests in ensuring that "competitors in the marketplace compete in a manner that is both lawful and proper."  See *Cabot Corp. v. King*, 790 F. Supp. 153, 158 (N.D. Ohio 1992).  As one court recognized: "[t]he public has no interest in destroying contracts, rewarding theft, and encouraging unethical behavior." *JDS Life Ins. v. Sun America, Inc.*, 958 F. Supp. 1258, 1283 (N.D. Ill. 1997), aff'd in part, vacated in part, 136 F.3d 537 (7th Cir. 1998).  Neal and Devine cannot be permitted to continue engaging in or encouraging unethical and unlawful behavior to help them get a leg-up on competitors.

Accordingly, the public interest favors the enforcement of Neal's Agreement through issuance of the requested injunctive relief.

## IV.    CONCLUSION

TQL faces continued imminent harm if the injunction is not issued immediately in the form of a temporary restraining order.  Neal has already committed a breach of his Agreement with TQL and, given his position with Devine, it is inevitable that this will continue to occur on a daily basis.  For the foregoing reasons, TQL respectfully requests that the Court enter a preliminary injunction, in the form attached hereto as Exhibit A.

EXHIBIT 2

Respectfully submitted,

*/s/ Scott K. Jones*

Scott K. Jones (0069859)
SKJ LAW
3825 Edwards Road; STE 103
Cincinnati, OH 45209
513-410-2074 (T)
513-536-6393 (F)
sjones@skj-law.com

*Counsel for Plaintiff Total Quality Logistics, LLC*

## RULE 65 CERTIFICATION / CERTIFICATE OF SERVICE

As required under Ohio Rule of Civil Procedure 65(A)(2), the undersigned counsel for Plaintiff Total Quality Logistics, LLC ("TQL") certifies that service of the filings in this action has been made or that reasonable efforts to accomplish service were made.

The undersigned certifies that on December 11, 2024, sufficient copies of this Motion, the Verified Complaint, the Motion for Expedited Discovery, and Plaintiff's Discovery Requests were provided to the clerk with prepaid overnight mail envelopes to be delivered to Defendants to the addressees set forth in the caption to the Verified Complaint. Additionally, on December 11, 2024, the undersigned emailed each of the preceding documents to Thomas C. Neal at the last known personal email addresses of Mr. Neal (Tcneal05@gmail.com) and what is believed to be the business email address of Mr. Neal at Devine Logistics, Inc. (cneal@devinelogisticsllc.com), and to the business email address for Andrew Wade (awade@devinelogisticsllc.com), who purports to be the Chief Executive Officer of Devine. To the extent that any emails are undeliverable, the undersigned certifies that he will attempt to telephone the intended recipient of the undeliverable email. The undersigned also informed Defendants that if they desired to participate in any hearing or conference with the Court, to call the undersigned.

Without immediate action, Defendants' intentional violative conduct and disregard for their Agreements and state law will continue to occur daily. Accordingly, the Court's immediate intervention is necessary to protect TQL's contractual rights and prevent the continued misappropriation of TQL's trade secrets.

*/s/ Scott K. Jones*

Scott K. Jones (0069859)

21