## IN THE COURT OF COMMON PLEAS FOR
## CLERMONT COUNTY, OHIO

| | | |
|---|---|---|
| TOTAL QUALITY LOGISTICS, LLC<br>4289 Ivy Pointe Blvd.<br>Cincinnati, OH 45245 | : | Case No. _____ |
| | : | Judge JUDGE MILES |
|     Plaintiff, | : | |
|     vs. | : | |
| NGAWANG CHOEPHEL<br>18814 SE 22nd Circle,<br>Vancouver, WA 98683 | : | **VERIFIED COMPLAINT** |
|     and | : | |
| ACCESS ONE LOGISTICS, INC.,<br>c/o Nobuyuki Suzuki<br>1233 W. Gardena Blvd.<br>Suite 100<br>Gardena, CA 90247 | : | |
|     and | : | |
| ACCESS ONE TRANSPORT, INC.,<br>c/o Nobuyuki Suzuki<br>1233 W. Gardena Blvd.<br>Suite 100<br>Gardena, CA 90247 | : | |
| | : | |
|     Defendants. | : | |

---

For its Complaint against Defendant Ngawang Choephel ("Choephel"), Access One Logistics, Inc., ("AOL") and Access One Transport, Inc., ("AOT") (AOL and AOT collectively, "Access One"), Plaintiff Total Quality Logistics, LLC ("TQL"), states as follows:

20068164v5

## NATURE OF THE ACTION

1.     Choephel is a former employee of TQL. At the start of his employment with TQL he signed an Employee Non-Compete, Confidentiality and Non-Solicitation Agreement ("Agreement"). (*See*, Agreement, attached as Exhibit 1). The Agreement contains one-year restrictive covenants as well as a tolling provision for any period of violation.

2.     Choephel now competes with TQL in violation of the Agreement in his work for a TQL competitor Access One Logistics, Inc., and/or Access One Transport, Inc, which are active freight brokerages that share the same address. Choephel announced on LinkedIn that he has begun working as the Sales and Operations Manager for Access One Logistics, Inc., and Choephel is using an Access One Transport, Inc., e-mail address. Indeed, Choephel confirmed the fact of his competition on July 27, 2023, when he attempted to obtain information from TQL using an Access One Transport e-mail address and listing his title as Sales & Operations Manager. That fact and other intentional acts of Choephel set forth herein constitute breach of contract, misappropriation of trade secrets, and tortious interference. Likewise, Access One's continued employment of Choephel involves the misappropriation of TQL trade secrets and constitutes tortious interference with TQL's Agreement with Choephel.

3.     TQL seeks compensatory damages, punitive damages, and the recovery of attorney fees incurred, all of which in total, including punitive damages state a claim for less than $75,000.

## PARTIES, JURISDICTION, AND VENUE

4.     TQL is an Ohio limited liability company with its principal place of business at 4289 Ivy Pointe Blvd., Cincinnati, Ohio 45245, in Clermont County, Ohio. TQL provides freight brokerage and third-party logistics services to customers throughout the United States.

2

20068164v5

5.     Choephel is a resident of Washington who resides at 18814 SE 22nd Circle, Vancouver, WA 98683. TQL employed Choephel from January 24, 2022, to June 15, 2023, in TQL's Portland, Oregon office.

6.     Access One Logistics, Inc. ("AOL"), is a corporation organized under the laws of California with its principal place of business at 1233 West Gardena Blvd, Suite 100, Gardena, CA 90247. AOL conducts business competitive with TQL.

7.     Access One Transport, Inc. ("AOT"), is a corporation organized under the laws of California with its principal place of business at 1233 West Gardena Blvd, Suite 100, Gardena, CA 90247.

8.     Jurisdiction and venue are appropriate because Choephel contractually agreed to venue and jurisdiction in this Court, and all improper acts and conduct were purposely directed against an Ohio company located in Clermont County, with damage purposely inflicted on such company, and all or part of the claims for relief arose in Ohio.

9.     As this suit seeks more than $25,000, but less than $75,000 from the Defendants on all theories of recovery pled, this Court has jurisdiction.

### FACTS

10.     TQL is one of the largest third-party logistics companies in the U.S. and operates in the highly competitive freight brokerage industry. TQL provides freight brokerage services, third-party logistics services, truck brokerage services, and assistance with supply-chain management throughout the U.S. TQL has operated as a federally authorized freight broker since 1997.

11.     TQL's customers are companies that want to ship goods from one location to another. Included among these customers are companies that want to ship their own goods and

3

20068164v5

other freight brokers who already agreed to ship goods on behalf of another customer but need assistance finding a carrier to fulfill the shipment.

12.     TQL does not own or operate any of its own trucks or trucking equipment. Nor does it employ any drivers to haul freight. Rather, TQL engages and coordinates independent motor carriers that are able and willing to haul freight at the times and places required by TQL customers.

13.     AOL is a competitor of TQL and has an active freight brokerage license through the U.S. Department of Transportation's Federal Motor Carrier Safety Administration under Docket Number MC 806119.

14.     AOT is a competitor of TQL and has an active freight brokerage license through the U.S. Department of Transportation's Federal Motor Carrier Safety Administration under Docket Number MC 828355.

15.     The third-party logistics industry and the freight-shipping industry are extremely competitive. Relationships with customers, carriers, and other brokers are critical to success. It is very common in the brokerage industry for companies to have non-compete and non-solicitation agreements with their employees and contractors.

16.     TQL spends significant amounts of time, money, and other resources to develop relationships with new customers and strengthen relationships with existing customers. TQL has also made substantial investments in developing and protecting the secrecy of its proprietary systems, processes, and procedures that it uses to manage its operations and to compete in the competitive logistics and freight industry.

17.     Therefore, TQL takes significant measures to protect its trade secrets, customer relationships, and other confidential information. For example, before beginning employment at TQL, all freight brokers, as well as many other types of employees, must sign restrictive covenants

4

20068164v5

that limit their ability to compete with TQL, to solicit TQL's customers or employees, or to disclose or misuse TQL's confidential information.

18.     TQL utilizes individualized passwords that must be routinely changed, for electronic access to its proprietary and confidential information. TQL employs internal system controls to prevent employees from viewing, downloading, physically removing and printing certain information, as well as keycards and badges for entry to its offices.

19.     Choephel sought employment with TQL and was hired January 24, 2022, as a Logistics Account Executive Trainee ("LAET"). Choephel spent 24 weeks training as an LAET, and he ultimately became a Logistics Account Executive ("LAE" or "Broker") for TQL.

20.     As evidenced by the 24 weeks it took him to complete the training as an LAET, TQL provided Choephel with extensive training on TQL's strategies and methods to succeed within the industry, including, without limitation, training on TQL's services, customers, pricing structure, sales strategies, and general operations. Choephel had no prior experience in freight brokerage or the third-party logistics industry before joining TQL, and TQL spent significant time and resources training Choephel to be successful in the logistics industry.

21.     Throughout his employment with TQL, Choephel acquired detailed knowledge of TQL's unique operations, including, without limitation: shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and supply-chain management services. Choephel also had extensive access to TQL's confidential and highly proprietary information for use in the performance of his job duties, including: proprietary software developed by TQL, operating policies and procedures, financial records (such as credit history and other similar information about current and prospective customers, suppliers, and motor carriers), information about pricing and the manner and mode of doing business, the terms of TQL's business

5

20068164v5

dealings and relationships with customers and motor carriers, contracts and agreements of all kinds, sales lists and strategies, and detailed customer and motor carrier lists and information.

22. Choephel was also required to manage relationships with TQL's existing customers and to develop relationships with prospective customers. As with all TQL LAEs, Choephel had regular contact with those existing and prospective customers and, in fact, served as the main point of contact from TQL for many of those customers.

23. Because of the access employees, like Choephel, receive while employed at TQL (as described above), Choephel was required to sign the Agreement prior to commencing employment. The Agreement provides that Choephel would be given access to "Confidential Information," which was defined to include, in part, information related to "marketing"; "sales lists and strategies"; "customer lists"; and "the terms of business dealings and relationships with Customers and Motor Carriers[.]" (Agreement at pg. 2).

24. Given the nature of the information Choephel had access to, the Agreement provides that, upon termination of employment, all Confidential Information remains the property of TQL. (Agreement at ¶ 4).

25. The Agreement further states, in relevant part, as follows:

**"5. Confidential Information is for TQL's Use Only.** Unless Employee has prior written consent from TQL, Employee shall not at any time during the course of his or her employment by TQL, and at all times thereafter, use for any purpose or publish, copy, disclose, or communicate to any individual, firm, corporation, or other business entity other than TQL, any Confidential Information, except as properly necessary and authorized by TQL in the conduct of TQL's business or as required by law. Employee agrees that all information disclosed to Employee or to which Employee has access during the period of his or her employment shall be presumed to be Confidential Information hereunder if there is any reasonable basis to believe it to be Confidential Information or if TQL appears to treat it as confidential.

**7. Presumption Regarding Confidential Information.** Employee agrees that Employee's engaging in any form of employment relationship with a Competing Business, as defined in Section 9 below, would necessarily result in Employee

6

revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL.

•••

**9(b). Covenants**. Employee agrees that... for a period of one (1) year after termination or cessation of Employee's employment for any reason: (i) Employee will not, directly or indirectly...engage in...any Competing Business...(ii) Employee will not directly or indirectly...in any...capacity or manner whatsoever...participate in any transportation-intermediary business that provides services anywhere in the Continental United States...(iii) Employee will not, directly or indirectly, solicit any Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor, or take any action, to divert business from TQL; (iv) Employee will not, directly or indirectly, interfere with, tamper with, disrupt, or attempt to disrupt any contractual or other relationship, or prospective relationship, between TQL and any Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor of TQL; and...(vi) It is further understood and agreed that the running of the one (1) year set forth in this Paragraph shall be tolled during any time period during which Employee violates any provision of this Agreement.

(c) **Trade Secrets**. The Employee recognizes and acknowledges that TQL's trade secrets, Customer lists, Motor Carrier lists, Load Management System, private processes, and other Confidential Information as they may exist from time to time are valuable, special, and unique assets of TQL's business, access to and knowledge of which are essential to performance of Employee's duties hereunder. Employee will not hereafter disclose such trade secrets, Customer lists, Motor Carrier lists, Load Management System, private processes, and other Confidential Information to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever, except as required by law, nor shall Employee make use of any such property for Employee's own purpose or the benefit of any person, firm, corporation, association, or any entity other than TQL under any circumstance.

(d) **Reasonableness of Restrictions**. Employee recognizes that the geographic, duration, and consent restrictions are reasonable and properly required for the adequate protection of the business of TQL from the disclosure of Confidential Information and unfair competition.

(e) **Injunction**. If there is a breach or threatened breach of any part of this Agreement, TQL shall be entitled to an injunction restraining Employee from such breach or threatened breach. Alternatively and additionally, TQL, in its sole discretion, may pursue a claim for damages in tort and/or contract resulting from any breach or threatened breach of this Agreement by Employee. If Employee is found by a court of competent jurisdiction to have violated the terms of this Agreement, Employee shall be liable for costs, expenses, and reasonable attorneys' fees incurred by TQL

7

20068164v5

> **10. Governing Law and Jurisdiction**. This Agreement shall be interpreted and enforced under the laws of the State of Ohio, without giving effect to conflict of law provision which would result in the application of any law other than Ohio law. Any action, suite, or proceeding with respect to or arising out of this Agreement shall be brought in the Court of Common Pleas, Clermont County, Ohio, the Court of Common Pleas, Allegheny County, Pennsylvania, the United States District Court for the Southern District of Ohio, or in the United States District Court for the Western District of Pennsylvania, Pittsburgh Division. Further, Employee hereby submits to the personal jurisdiction of the state and/or federal courts identified in this Section, consents to service of process therefrom, and waives any other requirements with respect to personal jurisdiction, venue, or service of process.

26.     When he joined TQL, Choephel agreed that TQL's "Confidential Information," whether or not formally designated as such, was vital to the success of TQL's business and that any unauthorized use or disclosure of TQL's Confidential Information would cause, or be likely to cause, substantial and irreparable harm and detriment to TQL and would constitute unreasonable and unfair competition to TQL. (*See*, Ex. 1).

27.     Choephel also agreed that TQL's Confidential Information was a proprietary trade secret with significant economic value, compiled through a substantial investment of time and money by TQL, and not common knowledge throughout the Industry.

28.     Choephel promised that he would at all times refrain from using, sharing, or disclosing TQL's Confidential Information to any individual or business entity (except as authorized by TQL in the conduct of TQL's business or as required by law).

29.     Choephel acknowledged that association with a business competitive with TQL would result in him revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL.

30.     Choephel further agreed that the running of the one (1) year non-competition restriction "shall be tolled during any time period during which Employee violates any provision of this Agreement."

8

20068164v5

31.  TQL's trade secrets, customer lists, and other "Confidential Information" are valuable, special, and unique assets of TQL's business that Choephel agreed to not disclose to anyone for any reason, except as required by law. Choephel further agreed that he would not make use of TQL Confidential Information for anyone other than TQL.

32.  Choephel agreed that the content, time, and geographic restrictions placed on them by the Agreement were reasonable and required for the protection of TQL's business and that a breach or threatened breach of any part of the Agreement, would entitle TQL to an injunction.

33.  In consideration of Choephel's Agreement set forth above, TQL hired him. TQL would not have allowed him to gain knowledge of its proprietary customer information or access to TQL key customer relationships if he had not executed his Agreement.

34.  Choephel separated from TQL on June 15, 2023. At the time of his departure, Choephel advised that he accepted a position with a company known to TQL. However, when Choephel departed from TQL on June 15, TQL found no proof of Choephel working for the company he identified as his purported employer upon his departure. Shortly thereafter though, on July 26, 2023, Choephel announced on his LinkedIn that he had joined Access One as its Head of Sales & Operations Management, an entirely different employer than the one he previously disclosed to TQL.

35.  AOL and AOT are "Competing Business[es]" under the Agreement since they are entities engaged in shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services in the United States.

36.  On July 27, 2023, the day after Choephel announced his employment with Access One on LinkedIn, TQL contacted Access One's president, Nobu Suzuki (who also serves as Access

9

20068164v5

One's registered agent), to inform Access One of Choephel's Agreement with TQL, including his one-year restrictive covenants.

37.     Choephel again confirmed his employment with the Access One entities on July 27,     2023,     when     he     e-mailed     TQL     using     the     e-mail     address "Ngawang.choephel@access1transport.com"and said the following:

Hello Brother,

William will re-explain what we need. Want to get this going pretty soon here. Please don't screw us and give us good rate as Wang would usually do. Thanks 😊

Kind regards,

**Ngawang Choephel**
**Sales/Operations Manager**
Ngawang.choephel@access1transport.com
**Access One Logistics, Inc.**
**1233 W. Gardena Blvd. Suite #100**
**Gardena, CA 90247**

38.     Notably, Choephel's email seems to refer to himself in the third person and discusses the rates he used to provide to Access One when he was employed at TQL. Access One, his current employer, is also a TQL customer that Choephel serviced during his time at TQL. The rate he provided to Access One while employed at TQL is information Choephel agreed to keep confidential pursuant to the Agreement. Choephel's email signature also indicates that his title is Sales/Operational Manager for Access One Logistics, Inc. Further, Choephel's e-mail copied Nobu Suzuki using the same e-mail for Mr. Suzuki that TQL had used to contact Mr. Suzuki on July 27, 2023.

39.     After TQL did not receive a response to its July 27, 2023, e-mail to Mr. Suzuki, TQL again contacted Access One by e-mailing Mr. Suzuki on July 31, 2023, and finally again on August 2, 2023. TQL never received any response from Mr. Suzuki or other representative of Access One.

40.     Access One continues to employ Choephel and is assisting him with and providing him with a platform for violating his Agreement.

10

20068164v5

## COUNT I – BREACH OF CONTRACT
### (Against Choephel)

41.     TQL incorporates by reference all of the previous paragraphs set forth in this Complaint as if fully rewritten herein.

42.     TQL and Choephel entered the Agreement.

43.     The Agreement is a valid and legally enforceable contract.

44.     The Agreement is reasonable.

45.     TQL performed its obligations under the Agreement.

46.     Choephel breached the Agreement by associating himself with Access One, Competing Businesses, as early as June 15, 2023, but not later than July 27, (*i.e.*, at the latest, only about a month after his departure from TQL).

47.     As a direct and proximate result of Choephel's actual or threatened unlawful conduct, TQL has suffered and will continue to suffer irreparable harm.

48.     Monetary damages alone will not be sufficient to remedy all of the harm caused to TQL by Choephel's breach of the Agreement.

49.     Choephel agreed that the content, time, and geographic restrictions placed on him by the Agreement were reasonable and required for the protection of TQL's business and that a breach or threatened breach of any part of the Agreement would entitle TQL to an injunction.

50.     Wherefore, TQL requests injunctive relief commanding Choephel to comply fully with the Agreement, with restrictive covenants extended as the result of the agreed tolling provision triggered by Choephel's breach. TQL further requests recovery of its attorneys' fees and compensatory damages in a sum that does not exceed $75,000.

20068164v5

## COUNT II TORTIOUS INTERFERENCE WITH A CONTRACT
### (Against Access One)

51.    TQL incorporates by reference all of the previous paragraphs set forth in this Complaint as if fully rewritten herein.

52.    The Agreement is valid and binding agreement between TQL and Choephel.

53.    At all relevant times, Access One knew or should have known of TQL's Agreement with Choephel. Further, on July 27, 2023, TQL informed Nobu Suzuki of Access One Logistics, Inc. of Choephel's Agreement with TQL.

54.    Despite this knowledge, Access One purposefully and intentionally interfered with the Agreement by, among other things, engaging Choephel to broker freight for Access One in direct competition with TQL and in violation of his Agreement. Access One has also provided resources, encouragement, and assistance to Choephel in breaching other provisions of his Agreement, including, but not limited to, the non-solicitation prohibition and the prohibition against the use and disclosure of TQL's confidential information.

55.    Access One has tortiously, willfully, and maliciously ignored the contractual obligations that Choephel owes to TQL, without any justifiable excuse, and in bad faith.

56.    As a direct and proximate result of Access One's conduct, TQL has been damaged by, among other things, the disclosure or threatened disclosure of TQL confidential information as well as the loss of sales revenue, customer relationships and goodwill, and fair competition. Monetary damages alone will be insufficient to remedy all of the harm caused to TQL by Access One's interference. As a direct and proximate result of Access One's actual or threatened unlawful conduct, TQL has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

20068164v5

TQL is entitled to a temporary restraining order and permanent injunction to prevent any such unlawful conduct.

57.     Wherefore, TQL requests a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Access One from tortiously interfering with TQL's Agreement with Choephel. TQL further requests recovery of attorneys' fees, compensatory damages, and punitive damages as permitted by law.

**COUNT III – MISAPPROPRIATION OF TRADE SECRETS**
**(Against All Defendants)**

58.     TQL incorporates by reference all of the previous paragraphs set forth in this Complaint as if fully rewritten herein.

59.     TQL has trade secrets and develops and maintains confidential and highly proprietary information, including, among other items, software systems, and other proprietary technology, information about its business dealings and relationships with its customers, customer lists, transactions, pricing, purchasing information, the manner and mode of doing business, contracts and agreements of all kinds (including those with customers and vendors), marketing, and sales lists and strategies.

60.     TQL's confidential information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, including TQL's competitors. And this information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy, including requiring all employees to agree to sign an agreement containing confidentiality and restrictive covenant provisions like those in Choephel's Agreement.

13

20068164v5

61.    TQL has spent a lot of time and significant resources, including financial and human resources, over the years, to develop and maintain this information.

62.    TQL's confidential information is protected, in whole or in part, as a trade secret within the meaning of Ohio Rev. Code § 1333.61(D).

63.    On information and belief, the Defendants have willfully misappropriated or threatened to misappropriate TQL's trade secrets including, among other things, TQL proprietary technology, TQL customer and carrier identities, customers and carrier lists, and other customer and carrier information for use against TQL and for the benefit of the Defendants within the meaning of Ohio Rev. Code § 1333.61(B)(2).

64.    As a direct and proximate result of the Defendants actual or threatened misappropriation of TQL's trade secrets, TQL has suffered, and will continue to suffer, immediate, substantial, and irreparable harm.

65.    TQL has no adequate remedy at law.

66.    Monetary damages alone will not be sufficient to remedy all of the harm caused to TQL by Defendants' actual or threatened misappropriation of trade secrets.

67.    Wherefore, TQL requests a temporary restraining order, preliminary injunction, and permanent injunction prohibiting the further use and misappropriation of TQL's trade secrets. TQL further requests recovery of its attorneys' fees, compensatory damages, and punitive damages for the willful actions taken by Defendants as permitted by law.

## COUNT IV – TORTIOUS INTERFERENCE WITH A CONTRACT/BUSINESS RELATIONS
### (Against All Defendants)

68.    TQL has contractual and/or business relationships with its customers and motor carriers of which Defendants are aware.

14

20068164v5

69.     As more fully described above, despite this knowledge, Defendants have knowingly and intentionally interfered with these contractual and/or business relationships for their own benefit.

70.     Defendants have acted without any justifiable excuse.

71.     As a direct and proximate cause of Defendants' conduct, as more fully described above, TQL has suffered damages in an amount to be proven at trial but exceeding $25,000. TQL is also entitled to a permanent injunction to prevent any further such unlawful conduct.

72.     Wherefore, TQL requests a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Access One from tortiously interfering with TQL's customer relationships. TQL further requests recovery of attorneys' fees, compensatory damages, and punitive damages as permitted by law.

## RELIEF REQUESTED

WHEREFORE, TQL respectfully requests remand and judgment in its favor and against Defendants as follows:

A.     Award TQL injunctive relief and/or specific performance as set forth above;

B.     Order Defendants to pay TQL compensatory damages in an amount to be determined at trial in excess of $25,000 but less than $75,000;

C.     Award punitive damages in an amount less than $75,000;

D.     Award TQL attorney fees, pre-judgment interest, costs and expenses, incurred in connection with this action in an amount less than $75,000;

20068164v5

E.    For all purposes combined, including the fair value of any injunctive relief, award TQL on all counts and claims for all requested relief an amount that does not exceed $75,000 in total; and

F.    Award TQL such other and further relief as this Court finds just and proper.

Respectfully submitted,

/s/ Augustus B. Flottman
Kellie Ann Kulka (0095749)
Augustus B. Flottman (0096102)
BRICKER GRAYDON LLP
312 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone:  (513) 629-2724
Fax:      (513) 651-3836
E-Mail: KKulka@brickergraydon.com
E-Mail: AFlottman@brickergraydon.com

*Attorneys for Total Quality Logistics, LLC*

16

20068164v5

**VERIFICATION**

STATE OF OHIO                )
                             ) ss.
COUNTY OF CLERMONT           )

I, Marc Bostwick, being duly cautioned and sworn, state that I am authorized to act as an agent of Plaintiff for the purpose of verifying the Complaint herein in accordance with the Ohio Rules of Civil Procedure. To the extent I have personal knowledge of the matters alleged in the Complaint, the information is true and accurate to the best of my knowledge and belief. As to any matters for which I do not have personal knowledge, I am authorized by Plaintiff to state that Plaintiff is informed and believes that the allegations of the Complaint are true and accurate to the best of its knowledge and belief.

Marc Bostwick

**NOTARY PUBLIC**

Subscribed and sworn by Marc Bostwick before me, a Notary Public, on this 7th day of

August, 2023.

Notary Public

**KELLY A. PIERRO**
Notary Public, State of Ohio
My Commission Expires
July 22, 2028
COMMISSION: 2018-RE-733648

**TO THE CLERK:**

Please serve Defendants by certified mail, return receipt requested. Thank you.

11720800.1

20068164v3

# EXHIBIT 1

20068164v5

17

**EXHIBIT**

**1**

## TOTAL QUALITY LOGISTICS, LLC

### Employee Non-Compete, Confidentiality and Non-Solicitation Agreement

#### (Oregon)

This Employee Non-Compete, Confidentiality and Non-Solicitation Agreement ("Agreement") is entered into by and between Total Quality Logistics, LLC ("TQL"), 4289 Ivy Pointe Blvd., Cincinnati, Ohio 45245, and the Employee whose name is set forth below his or her signature on the last page of this Agreement and whose address is on file with TQL ("Employee"). Performance under this Agreement will begin on the date Employee's employment with TQL actively begins.

#### RECITALS:

**WHEREAS**, in the event Employee resides in Oregon and/or works out of or is based at a TQL office or facility located in Oregon and Oregon law is held to apply to this Agreement despite the choice of law provision in Section 10 stating that it shall be interpreted and enforced under the laws of Ohio, then this Agreement shall be subject and conformed to meet the requirements and limitations applicable to non-compete agreements set forth in ORS 653.295, including but not limited to the requirement that Employee's first day of employment not occur until at least two (2) weeks after Employee's receipt of this Agreement since a noncompetition agreement is required as a condition of employment; and in such case TQL and Employee agree to the terms, conditions, and provisions contained in Section 14;

**WHEREAS**, TQL is an Ohio limited liability company providing shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and supply-chain management services throughout the Continental United States. References to TQL in this Agreement refer to TQL, its parent and subsidiary companies, all related entities, and its successors and assigns;

**WHEREAS**, TQL is unique within the organizations providing shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and supply-chain management services (the "Industry"). TQL has spent extensive time developing its goodwill and its relationships with Customers, Motor Carriers, suppliers, and others within the Industry. TQL provides extensive training on ways to succeed within the Industry. TQL also provides tools, such as proprietary software, that are unique within the Industry. The relationships, tools, and training developed by TQL will assist Employee in gaining intimate knowledge of TQL's business model, its Customers, Motor Carriers, suppliers, contact information, lanes, pricing, sales strategy, service, and other confidential and proprietary information. The knowledge learned at TQL is unlike what could be learned elsewhere within the Industry. TQL takes steps to protect the confidentiality of this information and it would have value to a TQL competitor. Employee, therefore, acknowledges and agrees that what Employee learns and is trained in at TQL would necessarily cause unfair competition if Employee took employment competitive to TQL;

OR                                                                              1

**WHEREAS**, TQL develops and maintains confidential proprietary information (hereinafter referred to as, "Confidential Information"), including but not limited to, its operating policies and procedures; computer databases; computer software; methods of computer software development and utilization; computer source codes; financial records, including but not limited to, credit history and information about Customers and potential Customers, Motor Carriers, and suppliers; information about transactions, pricing, the manner and mode of doing business, and the terms of business dealings and relationships with Customers and Motor Carriers; financial and operating controls and procedures; contracts and agreements of all kinds, including those with Customers, Motor Carriers, and vendors; pricing, marketing, and sales lists and strategies; Customer lists and Motor Carrier lists including contact names, physical and email addresses, telephone numbers, and other information about them; trade secrets; correspondence; accounts; business policies; purchasing information; functions and records; logistics management; and data, processes, and procedures. Confidential Information also includes any information described above which TQL obtains from another company and which TQL treats as proprietary or designates as Confidential Information, whether or not owned or developed by TQL. This information may be in tangible written form, computer databases, or it may be represented and communicated solely by oral expressions or business activities which are not reduced to written form. Confidential Information may be protected by patents, copyrights, or other means of protection. Confidential Information may be protected by patents, copyrights, or other means of protection. Confidential Information does not include information that is protected by the National Labor Relations Act ("NLRA"), and nothing in this Agreement shall be interpreted to prohibit employees from engaging in protected activity under the NLRA, including without limitation discussing wages, hours, or terms and conditions of employment. TQL will not prohibit or discipline any of its employees from or for discussing their wages, hours, or other terms and conditions of employment or engaging in any other activity protected by the NLRA;

**WHEREAS**, Employee agrees that any and all such Confidential Information set forth above, whether or not formally designated as such, is vital to the success of TQL's business and Employee understands that all such Confidential Information is the exclusive property of TQL, that it is to be treated and maintained as confidential proprietary information by Employee, and that it is treated and maintained as confidential proprietary information by TQL;

**WHEREAS**, in order to allow TQL to remain effective and competitive in the marketplace in which it conducts its business, and to maintain its business relationships on the basis of trust and confidence, it is essential that all Confidential Information remain protected from unauthorized disclosure, dissemination, and use, except as authorized and required by TQL to enable Employee to properly perform his or her work in the normal course of TQL's business;

**WHEREAS**, Employee acknowledges that unauthorized use or disclosure of Confidential Information as defined herein would cause, or be likely to cause, substantial and irreparable harm and detriment to TQL and would constitute unreasonable and unfair competition to TQL;

**WHEREAS**, Employee acknowledges that TQL's Customer and Motor Carrier lists, other information about TQL's Customers and Motor Carriers, its Load Management System, and other Confidential Information, are proprietary trade secrets with significant economic value, are

OR                                                                          2

compiled through a substantial investment of time and money by TQL, and are not common knowledge throughout the Industry;

**WHEREAS**, in the course and scope of employment by TQL, Employee must be given access to such Confidential Information from time-to-time or continuously, in order to effectively perform his or her job duties; and

**WHEREAS**, Employee desires to be employed by TQL and TQL will not agree to employ or continue to employ Employee, unless Employee signs this Agreement and agrees to be bound by it.

**NOW THEREFORE**, in consideration of the employment or continued employment of Employee by TQL, including compensation and benefits provided by TQL, and the terms, conditions, and covenants, set forth herein, which Employee considers adequate consideration for the promises contained herein, TQL and Employee agree as follows:

1.      Recitals. The "Recitals" set forth above are hereby restated and incorporated herein by reference as though fully set forth again.

2.      Employee Duties. Employee shall undertake and assume the responsibility of performing for and on behalf of TQL whatever duties shall be assigned to Employee by TQL at any time and from time-to-time. It is further understood that TQL retains the right to modify Employee's duties at any time and, in its discretion, determine Employee's compensation, including but not limited to, any salary, other cash compensation, and benefits.

3.      At-will Employment. Employee is an employee at-will. Nothing in this Agreement changes Employee's status as an at-will employee. Either TQL or Employee may terminate Employee's employment for any reason at any time.

4.      TQL Owns Confidential Information. All Confidential Information as described herein is proprietary and the sole property of TQL.

5.      Confidential Information Is for TQL's Use Only. Unless Employee has prior written consent from TQL, Employee shall not at any time during the course of his or her employment by TQL, and at all times thereafter, use for any purpose or publish, copy, disclose, or communicate to any individual, firm, corporation, or other business entity other than TQL, any Confidential Information, except as properly necessary and authorized by TQL in the conduct of TQL's business or as required by law. Employee agrees that all information related to TQL's business and disclosed to Employee or to which Employee has access during the period of his or her employment shall be presumed to be Confidential Information hereunder if there is any reasonable basis to believe it to be Confidential Information or if TQL appears to treat it as confidential.

6.      Return of Company Property. Upon termination of employment or upon request by TQL for any reason, Employee will immediately deliver to TQL all originals and all copies of all documents and other materials obtained from or belonging to TQL, including but not limited to

OR                                        3

all Confidential Information, regardless of form, in Employee's possession, custody, or control, including but not limited to any TQL files, documents (including any containing customer information), computer data, or other media however stored, and Employee will retain no copy of any such document, data, or other materials.

7. Presumption Regarding Confidential Information. Employee agrees that, during the time limits of the covenants identified in Section 9(b), Employee's engaging in any form of employment relationship with a Competing Business, as defined in Section 9 below, will be presumed to necessarily result in Employee revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL.

8. Property Rights and Assignment. Employee agrees that any work, invention, product design, or technological innovation created, conceived, developed, produced, generated, and/or improved by Employee, whether or not patentable, or subject to copyright, trademark, or trade secret protection, at any time during or arising out of Employee's employment with TQL that results from, is suggested by, or relates to any work which Employee does for TQL, shall be the absolute property of TQL and shall promptly be disclosed by Employee to TQL. Employee hereby assigns any and all right, title, and interest in any work product to TQL, including assigning any and all rights to any future invention arising out of or relating to Employee's employment with TQL. To the extent necessary, during employment and thereafter, Employee shall sign applications, assignments, and any other papers that TQL may consider necessary or helpful in perfecting and enforcing TQL's rights in, and to, any such invention, improvement, and/or technological innovation.

9. Covenants and Remedies.

(a) Agreement to Covenants and Material Breach. The Employee hereby covenants and agrees to the terms and conditions of the restrictive covenants and agreements set forth in Sections 4 through 9 of this Agreement, and agrees that any breach thereof shall constitute a material breach by the Employee of his or her obligations under this Agreement.

(b) Covenants. Subject to the applicability of Oregon law, specifically ORS 653.295 and Section 14 as described in the first Recital on page 1, Employee agrees that, during the course of his or her employment (except as required in the course of Employee's employment with TQL), and for a period of one (1) year after termination or cessation of Employee's employment for any reason:

(i) Employee will not, directly or indirectly, own, operate, maintain, consult with, be employed by (including self-employment), engage in, or have any other interest (whether as an owner, shareholder, officer, director, partner, member, employee, joint venture, beneficiary, independent contractor, agent, or any other interest) in any Competing Business (as defined below), except the ownership of less than 1% of the outstanding equity securities of any publicly-held corporation or entity;

(ii) Employee will not directly or indirectly, either as an employee, agent, consultant, contractor, officer, owner, or in any other capacity or manner whatsoever, whether

OR                                                                                      4

or not for compensation, participate in any transportation-intermediary business that provides services anywhere in the Continental United States, including but not limited to any person or organization that provides shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services;

(iii) Employee will not, directly or indirectly, solicit any Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor, or take any action, to divert business from TQL;

(iv) Employee will not, directly or indirectly, interfere with, tamper with, disrupt, use, or attempt to disrupt any contractual or other relationship, or prospective relationship, between TQL and any Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor of TQL; and

(v) Employee will not, directly or indirectly employ, recruit, solicit, or assist others in employing, recruiting, or soliciting any person who is, or within the previous twelve (12) months has been, an employee of, consultant with, or been party to another business relationship with TQL.

(vi) It is further understood and agreed that the running of the one (1) year set forth in this Section shall be tolled during any time period during which Employee violates any provision of this Agreement.

(c)     Trade Secrets. The Employee recognizes and acknowledges that TQL's trade secrets, Customer lists, Motor Carrier lists, Load Management System, private processes, and other Confidential Information as they may exist from time to time are valuable, special, and unique assets of TQL's business, access to and knowledge of which are essential to performance of Employee's duties hereunder. Employee will not hereafter disclose such trade secrets, Customer lists, Motor Carrier lists, Load Management System, private processes, and other Confidential Information to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever, except as required by law, nor shall Employee make use of any such property for Employee's own purpose or the benefit of any person, firm, corporation, association, or any entity other than TQL under any circumstance.

(d)     Reasonableness of Restrictions.     Employee recognizes that the foregoing geographic, duration, and content restrictions are reasonable and properly required for the adequate protection of the business of TQL from the disclosure of Confidential Information and unfair competition.

(e)     Injunction. If there is a breach or threatened breach of any part of this Agreement, TQL shall be entitled to an injunction restraining Employee from such breach or threatened breach. Alternatively and additionally, TQL, in its sole discretion, may pursue a claim for damages in tort and/or contract resulting from any breach or threatened breach of this Agreement by Employee. If Employee is found by a court of competent jurisdiction to have violated the terms of this Agreement, Employee shall be liable for costs, expenses, and reasonable attorneys' fees incurred by TQL.

(f)     For purposes of this Agreement, the term: (i) "Customer" is any individual, business, or other entity, for whom TQL has rendered any service, or with respect to which TQL has planned and/or made contact for the purpose of rendering any service, within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment; (ii) "Motor Carrier" is any over-the-road shipper, carrier, trucker, or hauling business that has transported freight for any TQL Customer as a result of a relationship, dealings, arrangements, or communications with TQL, or with respect to which TQL has planned and/or made contact for this purpose, within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment; (iii) "Competing Business" is any person, firm, corporation, or entity that is engaged in shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services anywhere in the Continental United States; and (iv) "solicit" includes, but is not limited to, any efforts in any form intended to take business away from, intercept, or interfere with the business of TQL, including relationships with TQL and its employees, Customers, Motor Carriers, clients, consultants, suppliers, vendors, lessees, lessors, and employees, and specifically, including doing business with any Customer or Motor Carrier.

(g)     Pursuant to the Defense of Trade Secrets Act, 18 U.S.C. § 1833(b), an individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made (1) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and solely for the purpose of reporting or investigating a suspected violation of law; or (2) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to the court order.

10.     Governing Law, Jurisdiction, and Venue.   This Agreement shall be interpreted and enforced under the laws of the State of Ohio, without giving effect to conflict of law provisions which would result in the application of any law other than Ohio law.  Any action, suit, or proceeding with respect to or arising out of this Agreement shall be brought in either the Court of Common Pleas, Clermont County, Ohio or the United States District Court for the Southern District of Ohio.  Further, Employee hereby submits to the personal jurisdiction of the state and/or federal courts of Ohio, consents to service of process therefrom, and waives any other requirements with respect to personal jurisdiction, venue, or service of process.

11.     Severability.  Should any of the provisions of this Agreement be declared or determined to be illegal or invalid, (a) the validity of the remaining parts, terms, or provisions shall not be affected thereby and said illegal or invalid part, term, or provision shall be deemed not a part of this Agreement; (b) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement; and (c) there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and still be legal, valid, and enforceable.

OR                                              6

12.     Personnel Policies. Employee agrees to abide by TQL's rules, regulations, policies, and practices, written and to the extent that Employee has actual knowledge thereof, unwritten, as they may from time to time be adopted or modified by TQL at its sole discretion. TQL's written rules, policies, practices, and procedures shall be binding on Employee unless superseded by or in conflict with this Agreement, in which case this Agreement shall govern. However, such rules, policies, practices, and procedures are not part of this Agreement and whether written, oral or implied, shall not create any contract between Employee and TQL at any time. Additional contractual obligations or other modifications of this Agreement may be made only by an express written agreement between Employee and TQL.

13.     No Conflicting Employee Agreement. Employee represents that Employee is not bound by any agreement or contract or other duty to a former employer or any other party which would prevent Employee from complying with any obligations hereunder or performing his or her duties as an employee of TQL.

14.     Oregon Law Contingency. This Section 14 applies only in the event that the condition stated in the first Recital on page 1 of the Agreement applies, that is, if it is held that Oregon law, specifically ORS 653.295, applies to the noncompetition covenants contained in this Agreement, including but not limited to those stated in Section 9.

        (a)     Initial Employment. TQL agrees to employ the Employee and the Employee agrees to be employed by TQL subject to the terms and conditions set forth in this Agreement and this Section 14. Employee hereby acknowledges, agrees, and represents that this is Employee's initial employment with TQL.

        (b)     Commencement of Initial Employment. The Employee acknowledges, agrees, and represents that Employee's first day of employment will be at least two (2) weeks after TQL informs the Employee that a noncompetition agreement is required as a condition of employment, that TQL informed Employee of this condition by delivering this Agreement to the Employee on the date of Employee's signature below, with the understanding and agreement that Employee's first day of employment would be 15 or more days after the date of Employee's signature.

        (c)     Employee Acknowledgements. Employee hereby acknowledges, agrees, and represents as follows:

        (i)     That Employee will be and is engaged in administrative, executive, or professional work who (A) performs predominantly intellectual, managerial, or creative tasks, (B) exercises discretion and independent judgment, and (C) earns a salary and is paid on a salary basis;

        (ii)     That TQL has a protectable interest because Employee will have access to TQL's trade secrets, as defined in ORS 646.461; and

OR                                                                7

           (iii) That Employee will have access to TQL's competitively sensitive confidential business or professional information that otherwise would not qualify as a trade secret, including but not limited to product and service development plans, product and service launch plans, and marketing strategy or sales plans.

        (d)   Duration of Non-compete Agreement.  The term of the non-compete covenants shall not exceed two (2) years from the date of the Employee's termination.

        (e)   Employee Compensation Restriction.

           (i) The non-compete covenants in this Agreement shall apply only if the total amount of the Employee's annual gross salary and commissions, calculated on an annual basis, at the time of the Employee's termination exceeds the median family income for a four–person family, as determined by the United States Census Bureau for the most recent year available at the time of the Employee's termination.

           (ii) Notwithstanding subsection (c)(1) and (e)(1) of this Section 14, the non-compete covenants in this Agreement shall be enforceable for the full term of this Agreement, for up to two years, if TQL provides the Employee, for the time the Employee is restricted from working, the greater of: (A) compensation equal to at least fifty percent (50%) of the Employee's annual gross base salary and commissions at the time of the Employee's termination; or (B) compensation equal to at least fifty percent (50%) of the median family income for a four-person family, as determined by the United States Census Bureau for the most recent year available at the time of the Employee's termination.

        (f)   Limitations.  The foregoing restrictions on non-compete covenants agreements do not apply to:

      (i) bonus restriction agreements, as defined in ORS 653.295(7)(a);
      (ii) a covenant not to solicit employees of TQL;
      (iii) a covenant not to solicit or transact business with customers of TQL; and
      (iv) TQL's right to protect trade secrets or other proprietary information by injunction or any other lawful means under other applicable laws.

15.   Acknowledgments.  Employee acknowledges and agrees that he or she:

(a) has had sufficient time within which to consider this Agreement before executing it;
(b) has carefully read and fully understands all of the provisions of this Agreement;
(c) knowingly and voluntarily agrees to all of the terms set forth in this Agreement;
(d) knowingly and voluntarily intends to be legally bound by this Agreement;
(e) has had sufficient opportunity to obtain and consult with his or her own lawyer regarding this Agreement; and
(f) has knowingly and voluntarily executed this Agreement.

OR                8

16.   Binding Agreement.  This Agreement shall be binding and enforceable upon the parties hereto, their heirs, representatives, successors, and assigns.  This Agreement is not assignable by Employee, but is fully assignable by TQL without notice or consent from the Employee.

17.   Entire Agreement.  This Agreement sets forth the entire agreement between the parties hereto pertaining to the subject of this Agreement, and fully supersedes in all respects any and all prior oral or written agreements or understandings between the parties hereto pertaining to the subject of this Agreement, including, but not limited to, the prior non-compete.   This Agreement may be amended or modified only upon a written agreement signed by both of the parties hereto.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which taken together shall constitute one Agreement.

**IN WITNESS WHEREOF**, the parties agree that this Agreement may be signed by electronic means, and by their electronic endorsement through TQL's system or their physical signature below, the parties intend to sign this Agreement and acknowledge that they have read this Agreement in its entirety; understand the terms of this Agreement; have had the opportunity to consult with legal counsel regarding the terms of this Agreement; and knowingly, voluntarily, and willfully enter into this Agreement without any duress or coercion of any kind.

**EMPLOYEE:**                                    **TOTAL QUALITY LOGISTICS, LLC**



**IF SECTION 14 APPLIES, EMPLOYEE'S FIRST DATE OF EMPLOYMENT/WORK SHALL BE AND IS 15 OR MORE DAYS AFTER THE DATE OF EMPLOYEE'S SIGNATURE ABOVE.**

OR                                                        9